WILLIAM M. FRANZ, Plaintiff and Counterdefendant-Appellant, v. CALACO DEVELOPMENT CORPORATION *et al.*, Defendants and Counterplaintiffs-Appellees.—WILLIAM M. FRANZ, Plaintiff and Counterdefendant-Appellee, v. CALACO DEVELOPMENT CORPORATION *et al.*, Defendants and Counterplaintiffs-Appellants.

Second District   Nos. 2—03—0672, 2—03—0699 cons.

Opinion filed October 21, 2004.

1130

Timothy G. Shelton and Jennifer L. Johnson, both of Hinshaw & Culbertson, of Chicago, for appellant.

Steven B. Bashaw, of Steven B. Bashaw, P.C., of Oak Brook, and John E. Waghorne, of John E. Waghorne & Associates, of Bloomingdale, for appellees.

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiff William Franz sued defendants, Calaco Development Corporation (Calaco Development) and Nunzio Casalino (Casalino), for breach of a partnership agreement between plaintiff and Calaco Development and breach of fiduciary duty. Defendants counterclaimed for declaratory judgment that plaintiff had become a general partner

in the partnership and that plaintiff violated the Illinois Mortgage Act (Mortgage Act) (765 ILCS 905/1 *et seq.* (West 2002)). After a bench trial, the trial court found for plaintiff on his breach of contract claim and his breach of fiduciary duty claim against Calaco Development, and against plaintiff on the breach of fiduciary duty claim against Casalino personally. The trial court found for plaintiff on both counts of defendants' counterclaim. Plaintiff and defendants appealed. The appeals have been consolidated. In plaintiff's appeal, we affirm, and in defendants' appeal, we affirm in part, reverse in part, and remand the cause.

## I. FACTS

On May 8, 1990, plaintiff, along with his brother, Frederic E. Franz, who is not a party to this litigation, entered into a partnership agreement with Calaco Development to form Calaco Limited Partnership (the partnership). Under the limited partnership agreement, plaintiff retained a 33.5% interest in the partnership, and Frederic retained a 16.5% interest, both as limited partners. Calaco Development, as the general partner, retained a 50% interest. Casalino was to serve as the chief operating officer of the partnership. Calaco Development was formed by Casalino and Sebastian Lorenzo, who is not a party to this litigation, for the sole purpose of serving as a general partner to the partnership. Casalino and Lorenzo each held a 40% share of Calaco Development; the remaining shares were held by parties not involved in this litigation.

The purpose of the partnership was to develop, market, and sell a piece of real estate known as Wedgewood, which was previously owned by plaintiff and Frederic Franz. Under the partnership agreement, the Franz brothers conveyed the real estate, valued at $3 million for purposes of the agreement, to the partnership in exchange for a $1 million payment from the partnership at the onset of the agreement, an additional $2 million in scheduled payouts from the partnership, and a share in profits generated by the partnership. Calaco Development was to contribute the initial $1 million and serve as general partner in exchange for $1 million in scheduled payouts from the partnership and a share in partnership profits. In order to secure their $2 million payments, the limited partners obtained a mortgage on Wedgewood signed by the general partner and by Casalino and Sebastian Lorenzo personally.

Under the partnership agreement, Calaco Development was not to accrue interest on its initial $1 million contribution before it was paid out as scheduled; however, the agreement stated that Calaco Development would receive interest on any loans to the partnership that the

general partner determined were needed to infuse cash into the partnership.

Three lots on the Wedgewood property were held out of the partnership agreement and instead transferred to persons on behalf of plaintiff. In exchange for holding these three lots out of the agreement, the limited partners granted Calaco Development exclusive rights in two Wedgewood lots of comparable value to those lots held out of the agreement.

The agreement also contained other limitations and duties for the general partner. It stated that Calaco Development could not assign or sell any part of its partnership interest in Wedgewood to third parties related to Casalino or Calaco Development, and it stated that any sale or transfer of interest in Wedgewood, other than individual sales, required written approval from the limited partners. The agreement also stated that the general partner was to obtain all financing for the project, provide monthly reports on the condition of the partnership to all partners, annually commission an audit of the partnership's accounts, and provide all partners with any information regarding the partnership upon request. It further stated that the general partner was responsible for any commissions due to third parties in bringing about the partnership agreement.

The parties twice modified the terms of the agreement by executing subsequent contracts allowing the general partner to sell lots out of the Wedgewood property to Villas of Wedgewood, an entity related to Casalino. The first modification, in 1991, allowed Villas of Wedgewood to purchase 22 lots from the partnership. On December 31, 1991, the modification expired on its own terms. The parties signed another modification to the partnership agreement, which allowed Calaco Development to transfer up to 45 lots to Villas of Wedgewood at a price of $50,000 per lot in 1992 and 1993 and $55,000 per lot in 1994. The second modification expired on December 31, 1994. Aside from those two modifications, the partnership agreement was not altered during the course of the partnership.

Though the partnership was able to develop Wedgewood, the property did not generate profits as the parties had anticipated. Running low on operating funds and having difficulty selling lots, Calaco Development transferred several lots to entities related to Casalino in order to infuse cash into the partnership. In addition to the agreed transfers discussed above, Calaco Development purchased 74 lots from the partnership for $40,000 per lot. Casalino also caused an additional 17 Wedgewood lots to be sold to Villas of Wedgewood, partially, he testified, in order to raise enough money to give the limited partners their scheduled distribution. The limited partners approved none of

these transfers in writing, and plaintiff alleges that some of the lots were transferred after the partnership had already contracted to sell them to third parties for a higher price than that paid by Calaco Development. Calaco Development also purchased 10 lots from the partnership in 1994 for $40,000 per lot, despite the fact that their modification contract required that the general partner pay $55,000 per lot.

The partnership was able to make all its scheduled payments to the limited partners, but after learning of the general partner's ongoing breaches of the partnership agreement, plaintiff refused to release his mortgage on Wedgewood. Calaco Development received its scheduled payouts but then immediately loaned those payouts back to the partnership in order to provide operating cash for the business.

On July 9, 1999, plaintiff filed a three-count complaint against defendants. In that complaint, plaintiff alleged that defendants breached the partnership agreement and breached their fiduciary duties to him. Defendants filed a two-count counterclaim seeking declaratory judgment that plaintiff had become a general partner in the partnership and that plaintiff violated the Mortgage Act by failing to release the Wedgewood mortgage upon full payment of the $2 million it secured.

Following a bench trial, the trial court found that Calaco Development breached the partnership agreement in several ways and that it also breached its fiduciary duty to plaintiff. The trial court awarded plaintiff the following damages:

    (1) $458,894.75 for the sale of lots out of the partnership without the limited partners' consent;

    (2) $30,485 for charging the partnership interest on the general partner's loans to the partnership immediately after its scheduled payouts;

    (3) $16,750 for moneys paid as commission out of partnership assets to John Best for his work in facilitating the partnership agreement;

    (4) $20,435 for plaintiff's share of proceeds on the transfer of two lots to the general partner in exchange for the three lots held out of the partnership agreement, because those two lots were not comparable in value to plaintiff's lots;

    (5) $50,250 for Calaco Development's purchase of lots in 1994 for $40,000 instead of the contractually agreed price of $55,000.

The trial court declined to award punitive damages to plaintiff, and it declined to hold Casalino personally liable to plaintiff. As for defendants' counterclaims, the court found that plaintiff was not a general partner of the partnership, and it denied relief to defendants under the Mortgage Act.

Plaintiff timely appeals the trial court judgment, asserting that Casalino individually breached a fiduciary duty to plaintiff and that the trial court erred in refusing to award punitive damages. Defendants also timely appeal, arguing that Calaco Development is entitled to recovery under the Mortgage Act, that Calaco Development is entitled to interest on its loan to the partnership immediately after its scheduled payouts, that the trial court erred in its valuation of the real estate involved, and that there was not sufficient evidence for the trial court to find that Calaco Development improperly paid commission to John Best out of partnership assets.

## II. PLAINTIFF'S APPEAL

### A. Casalino's Individual Liability for Breach of Fiduciary Duty to Plaintiff

■ Plaintiff's first issue on appeal is that Casalino breached his individual fiduciary duty to plaintiff. Plaintiff does not argue that the court should pierce the corporate veil of Calaco Development to find Casalino personally liable. Rather, he argues that, even though Casalino was not a signatory to the partnership agreement, he should still be found to have breached a fiduciary duty independent of the agreement because of his relationship to the other partners. We disagree.

Plaintiff cites *Bandringa v. Bandringa*, 20 Ill. 2d 167, 174 (1960), *Ditis v. Ahlvin Construction Co.*, 408 Ill. 416, 426-30 (1951), and *Hagerman v. Schulte*, 349 Ill. 11, 21 (1932), in support of the proposition that parties can owe a fiduciary duty regardless of, and independent from, any written agreement between the parties. Thus, plaintiff urges that Casalino should be held personally liable because he was so involved in the partnership that he created a fiduciary relationship between himself individually and the partners.

However, plaintiff's authority stands merely for the proposition that, where parties carry on as partners or joint venturers, either with or without a partnership agreement, they will owe one another a fiduciary duty. *Bandringa*, 20 Ill. 2d at 174; *Ditis*, 408 Ill. at 426-30; *Hagerman*, 349 Ill. at 21. *Bandringa* stands merely for the proposition that "a fiduciary relation does obtain between partners." *Bandringa*, 20 Ill. 2d at 174. In *Ditis*, the court found that there was a fiduciary relationship between parties despite the fact that there was no formal agreement between them, because they carried on as joint venturers. *Ditis*, 408 Ill. at 426-30. In *Hagerman*, the court likewise found that there was a fiduciary relationship between parties despite the fact that there was no formal agreement, because they carried on as joint venturers. *Hagerman*, 349 Ill. at 21. Therefore, in each of plaintiff's cases, the court inferred an agreement between the parties in order to find a fiduciary relationship.

Here, by contrast, the parties actually entered into a written contract; we need not infer their relationship. The written contract between the parties names Calaco Development, and not Casalino, as partner. None of the parties to the partnership agreement intended or believed that Casalino was personally entering into the partnership agreement. Casalino's involvement in the partnership was as the chief operating officer of Calaco Development, the general partner; he did not directly, personally share in the profits of the partnership. To allow plaintiff's position and hold Casalino personally liable for his involvement in the partnership would be to allow a plaintiff to hold a chief operating officer of a corporation personally liable for his involvement in corporate acts without first showing cause to set aside the corporate form. Because a director, officer, or shareholder may be held personally liable for corporate acts only where there is reason to set aside the corporate form (see *Fiumetto v. Garrett Enterprises, Inc.*, 321 Ill. App. 3d 946, 958 (2001); *In re Estate of Wallen*, 262 Ill. App. 3d 61, 68 (1994)), plaintiff's argument fails. Accordingly, we hold that Casalino did not breach a fiduciary duty he personally owed to plaintiff.

## B. Punitive Damages

Plaintiff's second issue on appeal is that he is entitled to punitive damages for Calaco Development's breach of fiduciary duty. We disagree.

■ The purposes of punitive damages are punishment of a specific defendant and both general and specific deterrence, and such damages will be awarded only where the defendant's conduct is willful or outrageous due to evil motive or a reckless indifference to the rights of others. *Proctor v. Davis*, 291 Ill. App. 3d 265, 285 (1997). Because punitive damages are not favored in the law (*Black v. Iovino*, 219 Ill. App. 3d 378, 393 (1991)), they are available only in cases where the wrongful act complained of is characterized by wantonness, malice, oppression, willfulness, or other circumstances of aggravation (*E.J. McKernan Co. v. Gregory*, 252 Ill. App. 3d 514, 536 (1993)).

### 1. Standard of Review for Punitive Damages Awards

At this point, we must digress to discuss the standard of review for punitive damages. Because we do not find elsewhere the complete analysis of the standard of review for punitive damages, we will attempt to provide it here.

■ For a bench trial, the steps are as follows:

(1) Whether punitive damages are available as a matter of law for the cause of action. This step is reviewed *de novo. Black v. Iovino*, 219 Ill. App. 3d at 393.

(2) Whether the facts prove willfulness or other aggravating fac-

tors. This factual finding is reviewed using a manifest-weight standard. See *In re Estate of Wernick*, 127 Ill. 2d 61, 83-85 (1989) (applying manifest-weight standard to trial court's finding that defendant's conduct was not willful or malicious).

(3) Whether punitive damages should be awarded. This decision is reviewed using an abuse-of-discretion standard. *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 378-79 (1994).

(4) The computation of the punitive damages award. The appellate court reviews this determination by looking at whether the amount was excessive (*Black*, 219 Ill. App. 3d at 393) or the result of passion, partiality, or corruption (*Levy*, 268 Ill. App. 3d at 379-80 (applying abuse-of-discretion to trial court's determination that punitive damages should be imposed and then stating there was no evidence of passion, partiality, or corruption influencing the amount of the award)).

For a jury trial, the steps are as follows:

(1) Whether punitive damages are available as a matter of law for the cause of action. This step is reviewed *de novo*. *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186-88 (1978) (determining that punitive damages would be available as a matter of law for the action in the case, but then reversing actual decision to award punitive damages in the particular case because the cause of action was novel).

(2) Whether the trial court submits the issue of punitive damages to the jury. The trial court submits the issue of punitive damages to the jury when it determines that, as a matter of law, the evidence will support an award of punitive damages. 22 Am. Jur. 2d *Damages* § 550 (2003). In other words, the trial court may submit the issue of punitive damages to the jury only if the plaintiff has made out a *prima facie* case for such damages. *Knecht v. Radiac Abrasives, Inc.*, 219 Ill. App. 3d 979, 983-84 (1991). This decision to submit the question to the jury is a matter reserved to the trial court and will not be reversed absent abuse of discretion. *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1072 (2001); see also *Proctor*, 291 Ill. App. 3d at 285-86 (circuit court's decision to submit punitive damages instruction to jury not reversed absent abuse of discretion).

(3) The jury finds as a matter of fact whether the defendant acted willfully or maliciously. This factual finding is reviewed under a manifest-weight standard. *Cirrincione v. Johnson*, 184 Ill. 2d 109, 116 (1998).

(4) The jury determines what amount of punitive damages to award, if any. *Knecht*, 219 Ill. App. 3d at 983-84. This determination will not be reversed unless it so excessive to indicate passion, partiality, or corruption. *E.J. McKernan Co.*, 252 Ill. App. 3d at 536.

(5) The trial court may, in its discretion, determine whether the jury award for punitive damages is excessive and, if so, enter a remittitur or a conditional new trial. 735 ILCS 5/2—1207 (West 2002). The trial court's decision regarding remittitur or a new trial will not be reversed absent abuse of discretion. *NC Illinois Trust Co. v. First Illini Bancorp, Inc.*, 323 Ill. App. 3d 254, 266 (2001).

We now digress further to discuss the standard of review for the amount of punitive damages. As noted above, in either a bench or a jury trial, the amount of a punitive damages award will not be reversed unless it is so excessive that it must have been a result of passion, partiality, or corruption. However, none of the above-cited cases states precisely what standard of review is used to determine if the amount of the award is excessive. See L. Schlueter & K. Redden, Punitive Damages § 6.1 (4th ed. 2000) ("the standard of review for [punitive] damages is not yet firmly embedded in the court system. Instead of stating clear guidelines, the courts generally list[ ] various factors to be considered") (hereinafter, Schlueter & Redden).

■ Determining the standard of review is a difficult, but important step. See T. O'Neill & S. Brody, *Taking Standards of Appellate Review Seriously: A Proposal to Amend Rule 341*, 83 Ill. B.J. 512 (1995) (opining on the importance of the standard of review in appellate decision-making and decrying the paucity of analysis generally given the issue) (hereinafter, O'Neill & Brody). Generally, the appropriate standard of review depends on three factors: (1) the type of decision-maker (judge or jury); (2) the type of case (civil or criminal); and (3) the type of issue being reviewed (fact or law). O'Neill & Brody, 83 Ill. B.J. at 513. In Illinois, a judge's or jury's findings of fact in a civil case are generally accorded manifest-weight review. O'Neill & Brody, 83 Ill. B.J. at 517 (disapproving of the application of a single standard of review to facts determined by a judge and a jury); K. Coles, *Mixed Up Questions of Fact and Law: Illinois Standards of Appellate Review in Civil Cases Following the 1997 Amendment to Supreme Court Rule 341*, 28 S. Ill. L.J. 13, 50 (2003) (hereinafter, Coles); 2A Ill. L. & Prac. *Appeal and Error* § 408 (2002) (stating that only two factors bear on standard of review: type of case and type of issue). A judge's rulings of law in a civil or criminal case are reviewed under the nondeferential *de novo* standard. O'Neill & Brody, 83 Ill. B.J. at 517.

■ In the context of punitive damages, either a judge or a jury may assess the award. Whether the assessment of punitive damages presents an issue of law or fact, however, is a more involved issue.

"In Illinois, the measure of damages is a question of fact to be decided by the trier of fact, and a reviewing court should not substitute its judgment for that of the trier of fact. [Citation.] A

reviewing court will not disturb [a] verdict unless all reasonable persons would agree that the amount is excessive. [Citation.] An award is considered excessive if it is outside the limits of fair and reasonable compensation, results from passion or prejudice, or is so large as to 'shock the judicial conscience.' " *Marchese v. Vincelette*, 261 Ill. App. 3d 520, 529-30 (1994) (in context of noneconomic damages in a personal injury case).

Determination of damages is typically a question of fact for the jury. *Snover v. McGraw*, 172 Ill. 2d 438, 447 (1996); see also *Cooper Industries Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 446-47, 149 L. Ed. 2d 674, 693-94, 121 S. Ct. 1678, 1691 (2001) (Ginsburg, J., dissenting) (arguing that assessment of punitive damages is no less a finding of fact than assessment of pain and suffering damages); C. Sunstein, D. Kahneman, & D. Schkade, *Assessing Punitive Damages (With Notes on Cognition and Valuation in Law)*, 107 Yale L.J. 2071, 2131 (1998) (likening punitive damages to pain and suffering damages in that both defy precise calculation). Thus, it is tempting to state that an assessment of punitive damages is a finding of fact.

■ However, a jury's award of punitive damages does not constitute a finding of pure fact. *Cooper Industries*, 532 U.S. at 437, 149 L. Ed. 2d at 687, 121 S. Ct. at 1686 (deciding seventh amendment issue and stating " '[u]nlike the measure of actual damages suffered, which presents a question of historical or predictive fact, [citation] the level of punitive damages is not really a "fact" "tried" by the jury.' [Citation.]"); R. Blatt, Punitive Damages: A State by State Guide to Law and Practice § 1.2 (2004) (jury assessment of punitive damages is not a fact under *Cooper Industries*) (hereinafter, Blatt).

Indeed, punitive damages are fundamentally unlike any other measure of civil damages. Blatt, § 1.3 (contrasting punitive damages with compensatory damages, special damages, contract damages, restitution, and equitable damages); 1 J. McCarthy, Punitive Damages in Bad Faith Cases § 1.62, at 251 (5th ed. 1990) ("compensatory damages and punitive damages are two different remedies with two different purposes") (hereinafter, McCarthy). Damages are generally measured by the difference in the plaintiff's position after the defendant's wrong compared to the plaintiff's position before the wrong; punitive damages are not so measured. Blatt, § 1.3. Punitive damages actually improve the position of the complaining party, while all other damages simply return the plaintiff to the position he held before the wrong. Blatt, § 1.3. The focus of punitive damages is not on the position of the party wronged, but the position of the party committing the wrong. Blatt, § 1.3; see also *Deal v. Byford*, 127 Ill. 2d 192, 204 (1989) (enormity of defendant's wrong and wealth of defendant

are factors to be considered in reviewing a punitive damages award). In contrast to other types of damages, a plaintiff may actually be enriched by an award of punitive damages.[1]

A glut of authority characterizes the assessment of punitive damages by a jury, not as a factual finding, but instead as a matter within the "discretion" of the jury.[2] *E.g.*, 22 Am. Jur. 2d *Damages* § 550 (2003) (citing cases from several jurisdictions); 15 A.L.R. 5th 242 (2004) (same); McCarthy, § 1.64, at 262 ("amount of [punitive] damages to be assessed \*\*\* is, in the first instance, in the discretion of the jury"); Schlueter & Redden, § 6.1(A), at 342 (citing several cases for the proposition that "[t]he decision to award punitive damages and a determination of the amount of such an award rests within the discretion of the jury"); T. Riley, Proving Punitive Damages: The Complete Handbook § 18.4, at 207 (1981) (instructing plaintiffs' lawyers to respond to excessiveness challenges to punitive damages awards by first noting that "imposition of a punitive damage [*sic*] award and the amount of the award itself lies within the sound discretion of the jury"); see also *E.J. McKernan Co.*, 252 Ill. App. 3d at 536; *Jines v. Seiber*, 193 Ill. App. 3d 390, 394 (1990); *Statler v. Catalano*, 167 Ill. App. 3d 397, 406 (1988); *Lipke v. Celotex Corp.*, 153 Ill. App. 3d 498, 507-08 (1987); *Hough v. Mooningham*, 139 Ill. App. 3d 1018, 1024 (1986); *Smith v. Seiber*, 127 Ill. App. 3d 950, 957 (1984); *Hazelwood v. Illinois Central Gulf R.R.*, 114 Ill. App. 3d 703, 711 (1983). Therefore, a punitive damages assessment cannot be characterized as a purely factual undertaking for purposes of determining the standard of review.

Punitive damages often are compared to criminal sanctions. *E.g.*, *Cooper Industries*, 532 U.S. at 432, 149 L. Ed. 2d at 684, 121 S. Ct. at

---

[1] The strongest rationale behind allowing this windfall to a plaintiff is that it gives incentive to citizens bringing actions and thus benefits the public by helping to deter malicious or wanton acts. Schlueter & Redden, § 6.1(C), at 350. However, there is no requirement that all punitive damages assessed be awarded to the plaintiff in a civil case. See 735 ILCS 5/2—1207 (West 2002) (trial court may apportion punitive damages award among plaintiff, plaintiff's attorney, and State of Illinois Department of Human Services).

[2] This common description of jury "discretion" likely traces the language that "damages are within the discretion of the jury, as they present a question of fact." *Nilsson v. NBD Bank of Illinois*, 313 Ill. App. 3d 751, 760-61 (1999). The use of the word "discretion" is misleading in determining the standard of review, because a discretionary act implies an abuse-of-discretion review. However, it is unchallenged that jury verdicts receive manifest-weight review. See, *e.g.*, *Nilsson*, 313 Ill. App. 3d at 761. That truism implicitly guides our analysis here.

1683 ("[punitive damages] have been described as 'quasi criminal' " and are intended to punish and deter). Both require the decision-maker to measure the enormity of the wrong and the deterrent effect of a potential punishment. Neither is intended to remedy a wrong but, instead, to punish and deter it. Neither is a finding of fact; both are instead expressions of moral condemnation of a defendant's actions. *Cooper Industries*, 532 U.S. at 432, 149 L. Ed. 2d at 684, 121 S. Ct. at 1683.

It might seem curious that, given the penal nature of punitive damages awards, juries are entrusted with assessment of punitive damages. See, *e.g.*, P. Mogin, *Why Judges, Not Juries, Should Set Punitive Damages*, 65 U. Chi. L. Rev. 179 (1998). The idea that the jury should have the power to assess punitive damages awards seems to derive both from the fact-sensitive nature of punitive damages awards and from historical development of the concept of punitive damages.

On the former point, the Supreme Court has stated that punitive damages depend on the peculiar circumstances of each case and also on a jury's finding as to the degree of a defendant's maliciousness. *Day v. Woodworth*, 56 U.S. (13 How.) 363, 371, 14 L. Ed. 181, 185 (1851); see also *Cooper Industries*, 532 U.S. at 437 n.11, 149 L. Ed. 2d at 688 n.11, 121 S. Ct. at 1686 n.11 (assessment is a "fact-sensitive" undertaking).

On the historical development of punitive damages, the Supreme Court has stated:

"Until well into the 19th century, punitive damages frequently operated to compensate for intangible injuries, compensation which was not otherwise available under the narrow conception of compensatory damages prevalent at the time. [Citations.] As the types of compensatory damages available to plaintiffs have broadened, [citation] [including allowing pain and suffering damages as compensatory damages,] the theory behind punitive damages has shifted toward a more purely punitive (and therefore less factual) understanding." *Cooper Industries*, 532 U.S. at 437 n.11, 149 L. Ed. 2d at 688 n.11, 121 S. Ct. at 1686 n.11.

Thus, punitive damages at one time included findings of fact that are now typically within the province of the jury (in the context of compensatory damages). Now, however, the element of historical or predictive fact-finding has become less integral to the calculus of a punitive damages award. Nevertheless, the assessment of a punitive damages award remains within the province of a jury, just as it was when compensatory and punitive damages overlapped by today's concepts.

Even though the assessment of punitive damages is not a purely factual finding, it is a "fact-sensitive" undertaking. *Cooper Industries*, 532 U.S. at 437 n.11, 149 L. Ed. 2d at 688 n.11, 121 S. Ct. at 1686 n.11. A jury uses its assessment of punitive damages to punish a defendant, deter future wrongdoing, and express its moral condemnation. *Cooper Industries*, 532 U.S. at 432, 149 L. Ed. 2d at 684, 121 S. Ct. at 1683. In determining whether an award is excessive in a given case, Illinois courts look to a fact-specific set of relevant circumstances, including: (1) the nature and enormity of the wrong; (2) the financial status of the defendant; and (3) the potential liability of the defendant. *Deal*, 127 Ill. 2d at 204. It is vital that each case be carefully assessed in light of the specific facts involved. *Deal*, 127 Ill. 2d at 204. Certainly, the first two factors listed above are highly fact-specific. See *Knecht*, 219 Ill. App. 3d at 984 (jury has a unique ability to articulate community values in evaluating the reprehensibility of a defendant's conduct for purposes of awarding punitive damages); *Kochan v. Owens-Corning Fiberglass Corp.*, 242 Ill. App. 3d 781, 798-99 (1993) (refusing to overturn jury award of punitive damages where defendant did not present evidence for second factor at trial level).

And, while the amount to be awarded in punitive damages rests largely within the province of the jury, that "discretion" is not arbitrary or unlimited. *Petsch v. Florom*, 538 P.2d 1011, 1014 (Wyo. 1975); see also *Pacific Mutual Life Insurance Co. v. Halsip*, 499 U.S. 1, 19-20, 113 L. Ed. 2d 1, 21, 111 S. Ct. 1032, 1044 (1991) (no violation of due process where jury discretion was not unlimited). Courts have developed guidelines to be used in determining whether an award of punitive damages made by a jury is unreasonable (Schlueter & Redden, § 6.1, at 342-50) and articulated standards for juries to follow in awarding punitive damages (Illinois Pattern Jury Instructions, Civil, Nos. 14.01, 35.01 (2000) (hereinafter, IPI Civil (2000))), and trial judges may order remittitur of excessive awards (735 ILCS 5/2—1207 (West 2002)).

What we are left with, then, is that the assessment of punitive damages is not a purely factual finding, but instead a highly fact-based assessment. As such, we cannot say that the assessment of punitive damages is solely an issue of fact or of law.

Illinois courts have begun to recognize that issues of mixed fact and law exist. See *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998), citing O'Neill & Brody, 83 Ill. B.J. 512 (mixed question of law and fact in which the issue is whether the law as applied to the established facts is or is not violated receives review under "clearly erroneous" standard). Some mixed issues are more fact-based than others, and the determination of the standard of

appellate review requires a recognition of the disparate institutional competencies of trial and appellate courts. See *Cooper Industries*, 532 U.S. at 440, 149 L. Ed. 2d at 689-90, 121 S. Ct. at 1687-88 (holding that *de novo* appellate review is required for constitutional challenges to punitive damages awards in part because institutional competence does not require deference to trial court); *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 392 (2001) (clearly erroneous standard of review falls between manifest-weight and *de novo* standards of review on continuum of amount of deference given the trial court or agency); see also Coles, 28 S. Ill. L.J. at 31-38 (discussing difficulty with use of rigid fact/law distinction and stating that most issues fall on a continuum between pure fact and pure law); H. Monaghan, *Constitutional Fact Review*, 85 Colum. L. Rev. 229, 233 n.24 (1985) (arguing that courts should not look to a rigid fact/law distinction in determining the standard of appellate review, partially because fact and law are overlapping and inseparable concepts) (hereinafter, Monaghan).

It has been argued that the proper way to determine the appellate standard of review is to take a "functional approach," that is, to predicate the standard of review not on the fact/law shorthand, but on an evaluation of the institutional competence of each level of the court system. Coles, 28 S. Ill. L.J. at 38-43. Thus, under the functional approach, a reviewing court should determine what degree of deference to give a lower court ruling based on which court is in a better position to rule on the issue in question. Coles, 28 S. Ill. L.J. at 38.

The assessment of punitive damages is a highly factual decision, which is appropriately made at the trial court level. The amount of an award should be a reflection of the fact finder's determination as to the degree of maliciousness evinced by a particular defendant's actions. *Day*, 56 U.S. (13 How.) at 371, 14 L. Ed. at 185. In reviewing the maliciousness of conduct for purposes of punitive damages awards, an appellate court is not in a position to reassess the credibility of the witnesses who testified at trial. *Deal*, 127 Ill. 2d at 204. A jury has a unique ability to articulate community values in evaluating the reprehensibility of a defendant's conduct for purposes of awarding punitive damages. *Knecht*, 219 Ill. App. 3d at 984. In determining the amount of punitive damages to award, a fact finder must also evaluate evidence of the defendant's financial worth, if presented. See *Kochan*, 242 Ill. App. 3d at 798-99 (refusing to overturn jury award of punitive damages where defendant did not present evidence of worth at trial level).

■ The highly factual nature of the assessment of punitive damages dictates that a great amount of deference should be afforded the

determination made at the trial court level. To reflect that deference, as well as the highly factual nature of the determination, the assessment of punitive damages should be reviewed at the appellate level based on a manifest-weight standard. See Coles, 28 S. Ill. L.J. at 71 (presuming that mixed question "clearly erroneous" standard could not be applied to a jury determination).

Affording manifest-weight review to a jury determination that is not purely factual is not as bold as it may appear at first glance, nor does it eschew the "mixed question" distinction articulated in *City of Belvidere*, 181 Ill. 2d at 205. Nearly all jury determinations necessarily involve some mixture of legal and factual analysis, or some application of law to facts. For example, in a tort case involving a defendant running a red light, the purely factual issues (the color of the light and when the defendant crossed the intersection) and legal issues (what duty of care a driver owes) are necessarily mixed in the jury's finding of negligence. O'Neill & Brody, 83 Ill. B.J. at 514. However, the application of a manifest-weight standard during appellate review of such a finding would hardly be challenged. See Monaghan, 85 Colum. L. Rev. at 232 n.22 (axiom that jury has no power but to find facts is incorrect, because juries often decide mixed questions, especially in tort cases). The essence of the question, as discussed above, is where on the fact-law continuum the issue falls (and thus what level of deference should be given to reflect varying institutional competencies). The issue of assessing punitive damages falls so far on the fact side of the continuum to dictate manifest-weight review.

In summary, a jury's assessment of punitive damages is not a finding of pure fact, but it is nevertheless a highly fact-sensitive undertaking that should be reviewed under a manifest-weight standard. A judge or jury's assessment of punitive damages will not be reversed unless the manifest weight of the evidence shows that the assessment was so excessive as to demonstrate passion, partiality, or corruption on the part of the decision-maker.

■ As a practical matter, we note that a defendant may challenge a punitive damages award on appeal either by challenging the jury award, as discussed above, or by challenging the trial judge's decision regarding remittitur of the award. Any allegedly excessive punitive damages award is subject to remittitur by the trial court. See 735 ILCS 5/2—1207 (West 2002) ("the trial court may, in its discretion[,] *** determine whether a jury award for punitive damages is excessive, and if so, enter a remittitur and a conditional new trial"); *Cooper Industries*, 532 U.S. at 433, 149 L. Ed. 2d at 685, 121 S. Ct. at 1684 ("[i]f no constitutional issue is raised, the role of the appellate court, at least in the federal system, is merely to review the trial court's

'determination [on remittitur] under an abuse-of-discretion standard' [citation]''); *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 412-13 (1997), quoting *Haid v. Tingle*, 219 Ill. App. 3d 406, 410 (1991) (where trial judge determines that verdict is excessive, " 'the judge may not allow the verdict to stand but must act to correct the injustice [through remittitur]; and the failure to do so is, itself, error' ''). We agree with the above authority and hold that a trial court's decision on whether it will remit the jury's award of punitive damages, and if so, in what amount, is reviewed based on an abuse-of-discretion standard.[3] *NC Illinois Trust Co.*, 323 Ill. App. 3d at 266.

Though there are two distinct challenges available to an appealing defendant, each challenge comes to the same basic inquiry: whether the jury's award was against the manifest weight of the evidence. Whether a defendant on appeal challenges the jury verdict or the judge's decision concerning remittitur simply determines how the discussion should be framed. To wit, when determining if a trial judge abused his or her discretion in a decision regarding remittitur, an appellate court will look to see whether the manifest weight of the evidence shows that the jury award of damages was excessive. *Hollowell v. Wilder Corp.*, 318 Ill. App. 3d 984, 990-91 (2001) (court did not abuse its discretion in denying remittitur of damages where damages verdict was not against the manifest weight of the evidence); see also *Maple v. Gustafson*, 151 Ill. 2d 445, 454-55 (1992) (ruling on motion for new trial is within discretion of trial court and should be granted when verdict is against the manifest weight of the evidence); *Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 168 (2003) (same); *cf. NC Illinois Trust Co.*, 323 Ill. App. 3d at 266-67 (equating review of remittitur of punitive damages awards, compensatory damages awards, and rulings on motions for new trial).[4]

■ To avoid confusion, we make one final note before turning to

---

[3]A trial judge may order remittitur by applying the same manifest-weight standard of review to the jury award as we would apply on appeal. See *NC Illinois Trust Co.*, 323 Ill. App. 3d at 266. In remitting an award, the trial judge must indicate some basis in fact for finding that the jury award was erroneous or excessive. *Dahan v. UHS of Bethesda, Inc.*, 295 Ill. App. 3d 770, 783 (1998).

[4]Indeed, the comparison between remittitur and a motion for new trial is apt. " 'A remittitur is an agreement by the plaintiff to relinquish, or remit *** excessive damages [citations] and to accept the sum which has been judicially determined to be properly recoverable damages [citation]. The only alternative to a remittitur *** is for the trial judge to order a new trial [citations]." *Luye v. Schopper*, 348 Ill. App. 3d 767, 779 (2004), quoting *Haid*, 219 Ill. App. 3d at 411. " 'The trial court must afford the plaintiff the choice of agreeing or refusing to the entry of remittitur, with the proviso that the plaintiff's refusal

the case before us. In *Cooper Industries*, 532 U.S. at 436, 149 L. Ed. 2d at 687, 121 S. Ct. at 1685-86, the Supreme Court declared that its constitutional review of the excessiveness of a punitive damages award would be *de novo*. See *O'Neill v. Gallant Insurance Co.*, 329 Ill. App. 3d 1166, 1181-82 (2002) (citing *Cooper Industries* and applying *de novo* standard to question of whether punitive damages award was unconstitutionally excessive). The standard of review for the constitutional question of whether a punitive damages award is excessive in violation of due process is indeed *de novo*, but that constitutional challenge is separate from the common-law challenge discussed above.[5] See, *e.g.*, *Cooper Industries*, 532 U.S. at 450, 149 L. Ed. 2d at 696, 121 S. Ct. at 1693 (Ginsburg, J., dissenting) (noting that the *de novo* review required by the majority requires courts to distinguish between ordinary common-law excessiveness and constitutional excessiveness); *Kochan*, 242 Ill. App. 3d at 797-99 (separating defendant's constitutional challenge to amount of punitive damages award from defendant's common-law challenge to the award); *Harris v. Archer*, 134 S.W. 3d 411, 437-41 (Tex. Civ. App. 2004) (considering constitutional challenge separately from common-law challenge).

## 2. Punitive Damages in the Current Case

Having set out the standard of review, we turn now to the case before us. Plaintiff cites *Wernick* for the proposition that the proper standard of review for the trial court's decision not to award punitive damages is whether the decision was against the manifest weight of the evidence. *Wernick*, 127 Ill. 2d at 83-84. Plaintiff's misapprehension is understandable. *Wernick*, and indeed other supreme court cases, do appear to indicate that the manifest-weight standard applies. See *Cirrincione*, 184 Ill. 2d at 115-16 (applying manifest-weight to a jury finding of fact but appearing to apply it to decision to award punitive damages); *Martin v. Heinhold Commodities, Inc.*, 163 Ill. 2d 33, 79-82

---

to agree to the entry of remittitur will result in the ordering of a new trial.' " *Luye*, 348 Ill. App. 3d at 779, quoting *Haid*, 219 Ill. App. 3d at 411-12.

[5]We also note that the constitutional challenge to a punitive damages award is significantly less fact-oriented than is the common-law challenge. The constitutional challenge requires a court to review three criteria: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Cooper Industries*, 532 U.S. at 440, 149 L. Ed. 2d at 689, 121 S. Ct. at 1687. Contrast those factors with the Illinois common-law factors cited herein. See *Deal*, 127 Ill. 2d at 204.

(1994) (appearing to apply manifest-weight standard to trial court's decision to award damages, after it determined that damages were available for the cause of action and that the defendant had acted willfully. The court in *Martin* cited *Black* for the proposition that the trial court's decision to award punitive damages will not be disturbed unless against the manifest weight, but *Black* states the standard of review as has been laid out here); *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 431 (1990) (Clark, J., dissenting) (quoting the manifest-weight standard from *Wernick* out of its context).

■ However, a careful reading of those cases shows that the courts applied the manifest-weight standard to the trial court's factual findings of the defendant's willfulness or recklessness, which supported the award of punitive damages. See *Wernick*, 127 Ill. 2d at 83-85; *Cirrincione*, 184 Ill. 2d at 115-16; see also *O'Neill v. Gallant Insurance Co.*, 329 Ill. App. 3d 1166, 1175-77 (2002) (applying manifest-weight standard to factual finding to support punitive damages).

Therefore, a careful reading of *Wernick* and related cases reveals that the manifest-weight standard applies to a trial court's findings of fact as to whether a defendant's conduct was willful or reckless; the decision whether to award punitive damages based on that finding is still a matter reserved to the discretion of the trial judge, as is stated herein. See *Levy*, 268 Ill. App. 3d at 378-79.

We now apply the above principles to the current case. Our case involves a bench trial. Punitive damages are available as a matter of law for a breach of fiduciary duty *(Levy*, 268 Ill. App. 3d at 379), and the trial court found that Calaco Development acted in bad faith. However, the trial court did not award punitive damages. The trial court's decision not to award punitive damages in this particular case will not be disturbed absent a showing of an abuse of discretion. A trial court does not abuse its discretion unless no reasonable person could take its view. *Barrett v. Fonorow*, 343 Ill. App. 3d 1184, 1197 (2003).

There is some evidence in the record to indicate that Calaco Development, through Casalino, acted willfully in breaching the partnership agreement. Casalino signed a modification agreement stating that he would pay $55,000 per lot he purchased from the partnership in 1994, but he purchased those lots for only $40,000 without notifying the limited partners. There was also evidence at trial that Casalino tried to prevent the limited partners from viewing the financial records of the partnership. Further evidence at trial suggested that Casalino might have purchased lots at a discount from the partnership after the partnership had already formed contracts to sell the very same lots to unrelated third parties and that Casalino then sold those same lots to the third parties himself at a higher price.

However, during his testimony, Casalino stated that he made all the above sales in order to infuse necessary cash into the partnership and that, without those sales, the partnership would have failed. Casalino claimed that he was not aware of the third-party purchasers who were ready to buy property from the partnership before that property was sold to him. He also claimed that he was purchasing the lots from the partnership at a fair value.

The trial court found that Calaco Development acted in bad faith, but it declined to award punitive damages. Even if we may not agree with the trial court's decision not to impose punitive damages, we cannot substitute our judgment for that of the trial court, which was in a better position to evaluate the conduct of the parties in the case. *Deal*, 127 Ill. 2d at 204. The trial court stated that it considered all the evidence in the case, and it declined to award punitive damages. We find that a reasonable person could have ruled the way the trial court did, and, therefore, we do not find an abuse of discretion in the trial court's decision.

## III. DEFENDANTS' APPEAL

### A. Calaco Development's Mortgage Act Claim

We now turn to the issues raised in defendants' appeal.

Defendants' first contention on appeal is that the trial court should have held plaintiff liable under the Mortgage Act for failing to release the mortgage on Wedgewood after the debt it had secured was paid in full. We agree.

In order to determine whether plaintiff was liable under the Mortgage Act, we first turn to the language of the statute. The Mortgage Act provides, in pertinent part:

"Every mortgagee of real property *** having received full satisfaction and payment of all such sum or sums of money as are really due to him from the mortgagor *** shall, at the request of the mortgagor *** make, execute and deliver to the mortgagor *** an instrument in writing *** releasing such mortgage." 765 ILCS 905/2 (West 2002).

The Mortgage Act further states:

"If any mortgagee *** knowing the same to be paid, shall not, within one month after the payment of the debt secured by such mortgage *** comply with the requirements of Section 2 of this Act, he shall, for every such offense, be liable for and pay to the party aggrieved the sum of $200 *** together with reasonable attorney's fees." 765 ILCS 905/4 (West 2002).

Questions of law, such as the interpretation of statutes, are reviewed *de novo*. *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232

(2001). The fundamental rule of statutory interpretation is to give effect to legislative intent. *Wilk v. Wilmorite, Inc.*, 349 Ill. App. 3d 880, 886 (2004). Where a statute is unambiguous, it must be enforced as enacted, and a court can never depart from its plain language by reading into it exceptions, limitations, or conditions which conflict with the clearly expressed legislative intent. *County of Knox ex rel. Masterson v. Highlands, L.L.C.*, 188 Ill. 2d 546, 556 (1999); *Wilk*, 349 Ill. App. 3d at 886.

The Mortgage Act allows a mortgagor, who has paid in full, to compel a release of his mortgage and to recover a penalty and reasonable attorney fees from his mortgagee. *American Garden Homes, Inc. v. Gelbart Fur Dressing*, 238 Ill. App. 3d 64, 66 (1992).

Neither party disputes the fact that the limited partners were fully paid the $2 million owed them under the partnership agreement. Instead, the crux of plaintiff's argument on appeal is that he should be excused from the requirements of the Mortgage Act because, in this situation, his releasing the mortgage on the property would have only assisted defendants in breaching the partnership agreement, by facilitating the sale of Wedgewood lots without the consent of the limited partners. Plaintiff also asserts that he should be excused from compliance with the Mortgage Act by Calaco Development's breach of the partnership agreement.

However, the statute itself does not provide for any excuse. Nor does it provide that, before obtaining a release, a mortgagor must fulfill any obligations other than payment of the debt secured by the mortgage. See 765 ILCS 905/2, 4 (West 2002); *Markus v. Chicago Title & Trust Co.*, 373 Ill. 557, 560 (1940) (a mortgage is "but incident to [a] debt"); *American Garden Homes*, 238 Ill. App. 3d at 67 ("The purpose of the [Mortgage] Act is to allow the mortgagor to obtain a release when the *terms of the mortgage* have been fully satisfied" (emphasis added)). It states only that the mortgagee must release his mortgage after receiving "satisfaction and payment of all such sum or sums of money" as are owed under the mortgage, and, where he knowingly fails to release the mortgage one month after "payment of the debt secured" by the mortgage, he shall be liable for damages under the Mortgage Act. 765 ILCS 905/2, 4 (West 2002).

■ Here, the Mortgage Act unambiguously requires a mortgagee to release his mortgage upon receiving full payment under the mortgage, and it unambiguously gives a mortgagor a right to damages where the mortgagee does not comply. Plaintiff does not present any authority for his proposition that he was excused from complying with the Mortgage Act. Accordingly, we hold that the trial court erred in denying relief under the Mortgage Act, and Calaco Development is entitled to damages.

Having determined that plaintiff violated the Mortgage Act, we must now determine what damages must be assessed against him for his violation. Calaco Development argues that it is entitled to a $200 payment for each individual lot in the Wedgewood property for which it has not obtained a written release from plaintiff. However, although the partnership was in the practice of obtaining a release for each individual lot as it sold those lots, there is only one underlying mortgage on the Wedgewood property. Therefore, there is only one offense under section 4 of the Mortgage Act. See 765 ILCS 905/4 (West 2002). Calaco Development is entitled to the statutorily mandated $200 for the failed release of the mortgage, and no more.

The Mortgage Act also requires that the violating mortgagee pay reasonable attorney fees associated with obtaining the mortgage release. The claim under the Mortgage Act comprises only a part of this litigation. In such a situation, Illinois courts acknowledge that, where a party's claims for relief involve a common core of facts or related legal theories, and counsel's time is devoted generally to the litigation as a whole, it may become difficult to divide the hours expended on a claim-by-claim basis. *Pietrzyk v. Oak Lawn Pavilion, Inc.*, 329 Ill. App. 3d 1043, 1047 (2002), citing *Hensely v. Eckerhart*, 461 U.S. 424, 435, 76 L. Ed. 2d 40, 51-52, 103 S. Ct. 1933, 1940 (1983). " 'Such a lawsuit cannot be viewed as a series of discrete claims [for purposes of determining an award of attorney fees for one of the claims]. Instead the *** court should focus on the significance of the overall relief obtained by the [party] in relation to the hours reasonably expended on the litigation.' " *Pietrzyk*, 329 Ill. App. 3d at 1047, quoting *Hensely*, 461 U.S. at 435, 76 L. Ed. 2d at 51-52, 103 S. Ct. at 1940. This principle applies in actions to recover attorney fees under the Mortgage Act where the mortgagor prevails under the Mortgage Act but loses on other claims in the same litigation. *Pietrzyk*, 329 Ill. App. 3d at 1048, citing *American Garden Homes*, 238 Ill. App. 3d at 69-70.

However, in the current case, unlike in *American Garden Homes*, the claims are sufficiently discrete to be separated. In *American Garden Homes*, the defendants refused to release a mortgage and thus held partnership property "hostage" and frustrated the partnership's attempts to sell the property. *American Garden Homes*, 238 Ill. App. 3d at 68. The focus of the litigation was the dissolution of the partnership deadlock, and the Mortgage Act claim there was simply one way the plaintiff sought to dissolve that deadlock. *American Garden Homes*, 238 Ill. App. 3d at 70. Here, by contrast, the focus of the litigation was defendants' breaches of the partnership agreement. The only relationship between the Mortgage Act issue and the other issues is that

plaintiff refused to release his mortgage as a self-help remedy for defendants' breaches of the partnership agreement. Therefore, we find that the Mortgage Act claim is discrete from the other claims, and reasonable attorney fees may be awarded for work on only this one claim. Because defendants' Mortgage Act claim involved a straightforward application of the law, and very little time at trial was devoted to the issue, we expect that attorney fees awarded to defendants will be minimal.

In sum, under the Mortgage Act, Calaco Development is entitled to $200 damages plus reasonable attorney fees, as described above, for plaintiff's failure to release the mortgage on Wedgewood. In addition, we hold that, along with paying damages, plaintiff must also execute and deliver a release of the mortgage as required by section 2 of the Mortgage Act.

### B. Calaco Development's Claim to Interest on Loans to the Partnership

Defendants' second contention on appeal is that the trial court erred in finding that Calaco Development was not entitled to interest on its loans to the partnership. We disagree.

In settling this issue, we turn first to the language of the contract. The partnership agreement in this case states, in relevant part:

> "*Additional Loans by the General Partner.* If the General Partner determines that additional cash is needed for Partnership purposes, the General Partner may loan the amount thereof at an annual rate equal to then current prime. *** Notwithstanding this paragraph, the General Partner acknowledges, however, that if *** it treats its initial $1 million contribution as a loan rather than [a] capital [contribution], that said loan shall not bear interest."

A covenant of good faith and fair dealing is implicit in every contract as a matter of law. *Diamond v. United Food & Commercial Workers Union Local 881*, 329 Ill. App. 3d 519, 526-27 (2002). The doctrine of good faith requires a party vested with contractual discretion to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. *Citicorp Savings of Illinois v. Rucker*, 295 Ill. App. 3d 801, 808 (1998).

Where the facts are not in dispute, interpretation of a written contract is a matter of law. *Ford v. Dovenmuehle Mortgage, Inc.*, 273 Ill. App. 3d 240, 244 (1995). However, a trial court's factual finding as to whether a party performed in good faith on a contract will not be reversed unless it is against the manifest weight of the evidence. See *Midwest Television, Inc. v. Oloffson*, 298 Ill. App. 3d 548, 558 (1998) (applying manifest-weight standard to trial court's determination of good-faith performance on a contract).

■ In the current case, the trial court found that Calaco Development breached its fiduciary duty of good faith and honesty. It also found that Calaco Development's loans back to the partnership were "suspicious," that there was not sufficient evidence to prove that the partnership needed the loans, and that Casalino's testimony on the issue was not credible. The trial court's finding that Calaco Development breached a fiduciary duty and did not perform in good faith or with proper motive was adequate basis for its denial of interest to Calaco Development for its loans to the partnership. Since the trial court's findings of fact will not be disturbed unless they are against the manifest weight of the evidence, and since the record is replete with evidence supporting the trial court's conclusion that defendants acted in bad faith, we will not disturb the trial court's judgment that Calaco Development's loans were executed in bad faith. We affirm the trial court's denial of Calaco Development's claim for interest on its loans back to the partnership.

### C. Trial Court's Reliance on Plaintiff's Witness for Valuation of the Property

Defendants' third contention on appeal is that the trial court erred in relying on plaintiff's witness for valuation of the Wedgewood property and determination of plaintiff's damages. We disagree.

An appellate court will defer to the judgment of the trial court regarding property valuation unless the trial court's decision was against the manifest weight of the evidence. *In re Application of County Treasurer*, 131 Ill. 2d 541, 550 (1989); see *Hickory Creek Nursery, Inc. v. Johnston*, 167 Ill. App. 3d 449, 455 (1988) (reversing trial court's finding as to value of a corporation based on manifest-weight-of-the-evidence standard).

■ Here, plaintiff and defendants brought competing expert testimony to establish Wedgewood's value for the purpose of computing plaintiff's damages. In arguing that the trial court erred by relying on plaintiff's expert, Daniel Nillen, in establishing the value of the property, defendants attack Nillen's qualifications, experience, and methodology. Nillen based his testimony on comparable sales in Wedgewood and also of nearby land. He also used an "allocation method" whereby he used the "land-to-value" ratio of nearby properties, along with a fixed percentage markup to account for the higher quality of the Wedgewood development, to help assess the value of vacant lots in Wedgewood.

Defendants' expert, Michael MaRous, on the other hand, used several developments outside of Wedgewood to gauge the value of comparable sales, and he criticized Nillen's partial reliance on the al-

location method and a markup. However, MaRous, unlike Nillen, did not base his valuation on sales of lots within the Wedgewood property. MaRous also did not mark up the value of his comparable lots, which were admittedly of lower quality than the Wedgewood lots. While MaRous seemed to have more established appraisal qualifications, plaintiff points out that MaRous makes significant income by testifying in litigation and is essentially a "professional witness."

The trial court found Nillen's testimony to be more credible. In our view, a finder of fact could have found either expert's testimony more credible than the other's, as both opinions were supported by adequate facts. In other words, there was no manifest weight of the evidence regarding valuation, and thus the trial court's determination cannot be contrary to the manifest weight.

### D. Trial Court's Determination That John Best Was Paid Commission Out of Partnership Assets

Defendants' final contention on appeal is that the trial court erred in finding that Calaco Development paid John Best a commission out of partnership assets. We disagree.

In a bench trial, it is the function of the trial judge to weigh the evidence and make findings of fact. *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 433 (1991). The trial judge, as the trier of fact, is in a position superior to a court of review to observe the demeanor of witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive. *Application of County Treasurer*, 131 Ill. 2d at 549. Therefore, where the testimony is conflicting in a bench trial, the trial court's findings will not be disturbed unless they are against the manifest weight of the evidence. *Application of County Treasurer*, 131 Ill. 2d at 549.

Defendants argue that the testimony of John Best is the only evidence to support the finding that Best was paid out of partnership assets, and not out of Calaco Development's assets as required under the partnership agreement. Best testified that he was given a real estate lot out of partnership assets as his commission, which he later sold for approximately $50,000. Casalino, however, testified that Best was not paid out of partnership assets, and he stated that the $50,000 for the sale of the lot was given to the partnership and not to Best.

The trial court found Best's version of events to be more credible. It noted that there was documentary evidence supporting Best's testimony, and it found that Best was a disinterested and reliable witness. Casalino's testimony, on the other hand, was found to lack credibility. We hold that not only is the trial court's finding not contrary to the manifest weight of the evidence, it is actually supported by the manifest weight of the evidence.

# IV. CONCLUSION

On plaintiff's appeal, No. 2—03—0672, the trial court's decision denying personal liability of Casalino for breach of fiduciary duty is affirmed, as is the trial court's finding that punitive damages should not be imposed against Calaco Development. On defendants' appeal, No. 2—03—0699, the decision of the trial court denying recovery to Calaco Development under the Illinois Mortgage Act is reversed. The trial court's denial of interest payments to Calaco Development for its loans to the partnership is affirmed. The trial court's findings with respect to valuation of the Wedgewood property and the commission paid to John Best are affirmed. We remand the cause for further proceedings consistent with this opinion.

The judgment of the circuit court of McHenry County is affirmed in part and reversed in part, and the cause is remanded with directions.

No. 2—03—0672, Affirmed.

No. 2—03—0699, Affirmed in part and reversed in part; cause remanded with directions.

BOWMAN and KAPALA, JJ., concur.