2021 IL App (1st) 200247-U

SIXTH DIVISION
December 23, 2021

Nos. 1-20-0247 & 1-20-0271 (cons.)

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| FRANK KAINRATH, RAUL AGUIRRE, and JASON PYLE, | ) | |
| | ) | Appeal from the |
|     Plaintiffs-Appellees and Cross-Appellants, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | |
| JAY GRIDER, Individually and in His Official Capacity as | ) | No. 19 L 1426 |
| Stickney Township Assessor, LOUIS S. VIVERITO, | ) | (reassigned from |
| Individually and in His Official Capacity as Stickney Township | ) | 15 L 6481) |
| Supervisor, and the TOWNSHIP OF STICKNEY, | ) | |
| | ) | |
|     Defendants, | ) | Honorable |
| | ) | Daniel T. Gillespie |
| (Jay Grider, Individually and In His Official Capacity as | ) | and Maura Slattery Boyle, |
| Stickney Township Assessor and the Township of Stickney, | ) | Judges Presiding. |
| Defendants-Appellants and Cross-Appellees). | ) | |

JUSTICE MIKVA delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Each of the parties' arguments is rejected and the judgment entered by the circuit court on the jury's verdict is affirmed.

¶ 2    The plaintiffs in this case, current or former municipal officeholders and employees of the

City of Burbank, Illinois, sued the assessor of Stickney Township for sending a letter that they

alleged defamed them and placed them in a false light. This is the second time this case has been before this court. In the first appeal, we rejected the defendants' argument that they were protected from this lawsuit by the Citizen Participation Act (735 ILCS 110/1 *et. seq.* (West 2014)), this state's anti-SLAPP (Strategic Lawsuits Against Public Participation) Act. *Kainrath v. Grider*, 2018 IL App (1st) 172270, ¶ 1. On remand, after additional discovery and a weeklong trial, the jury found in plaintiffs' favor on five of the six claims tried and awarded them a total of just under $200,000 in compensatory and punitive damages. Both sides now ask us to reverse on legal, evidentiary and policy grounds. The parties raise a minimum of fourteen claims of error, each with various subclaims. For the reasons that follow, we reject all of their arguments and affirm the judgment of the circuit court.

¶ 3                                                     I. BACKGROUND

¶ 4                        A. Allegations and Motions On the Pleadings

¶ 5      The plaintiffs in this case are Frank Kainrath, the former building commissioner of Burbank, Illinois; Jason Pyle, a former Burbank alderman and employee of the Cook County Assessor's office; and Raul Aguirre, a former employee of both the Burbank Zoning Department and the Cook County Board of Review. In 2013, Mr. Kainrath and Mr. Pyle supported Mr. Aguirre in his unsuccessful run against defendant Jay Grider for the position of Stickney Township Assessor. Plaintiffs alleged that sometime in June 2015, Mr. Grider, in his official capacity as assessor, sent a defamatory letter accusing them of "wrongful and criminal acts" to a number of individuals, including the Cook County Assessor, the mayor of Burbank, the Better Government Association, and various news organizations.

¶ 6      We summarized Mr. Grider's letter as follows in our decision on interlocutory appeal:

             "Mr. Grider's June 2015 letter, which plaintiffs attached to their complaint, bore

2

the heading, 'Why homeowners in Burbank can't catch a break on their property taxes' and stated that it was 'By Jay Grider, Assessor[,] Stickney Township.' In the letter Mr. Grider described how, '[i]n the course of processing the paperwork that comes through [his] office and reviewing public records online,' he had 'discovered how several current and former public servants used their inside status to scratch their own backs and lower their own property taxes—causing [the] homeowners of Burbank to pay more property taxes.'

Mr. Grider asserted in the letter that '[a]t the top of th[at] ethically-challenged group' and 'tax cheating posse' was Mr. Kainrath, who as building commissioner had 'follow[ed] a pattern of withholding [the] assessable building permits of his preferred network of home builders and contractors *** to delay the improved properties from reaching the tax rolls in a timely manner.' According to the letter, Mr. Kainrath was also a 'Top Ten rental-property owner in Burbank,' who used land trusts to hide his ownership interests in multiple single-family homes and who for years had received 'multiple illegal homeowner exemptions,' until 'the Erroneous Exemption law went into effect.'

The letter described Mr. Pyle, an employee of the Cook County Assessor's office for over 10 years, as 'Kainrath's primary inside connection' for illegal exemptions. Mr. Grider asserted in his letter both that Mr. Kainrath developed and owned the property then used by Mr. Pyle as a primary residence and that Mr. Pyle assisted Mr. Kainrath with property tax appeals to reduce the assessed value for the property in 2010-12.

According to Mr. Grider's letter, 'former Burbank Zoning Department employee Raul Aguirre,' who 'worked for the County Board of Review until his retirement in 2012,' also helped Mr. Kainrath with property tax appeals and 'bled taxpayers through illegal exemptions and inside-access to property tax appeals for real estate he owned in Burbank.'

3

The letter concluded by explaining that Mr. Grider enjoyed his job as township assessor, 'saw it as [his] duty to bring the above listed transgressions to light so the taxpayers in Burbank c[ould] get some relief,' and believed that what he had detailed in his letter was 'only the tip of the iceberg for th[e] situation.' " *Kainrath*, 2018 IL App (1st) 172270, ¶¶ 4-8.

¶ 7 Plaintiffs alleged that the statements in Mr. Grider's letter were false and defamatory *per se*, would be highly offensive to a reasonable person, and presented them in a false light to the public. They further asserted that because Mr. Grider was acting in his role as Stickney Township Assessor, the township was also liable for his conduct. Plaintiffs sought a judgment against Mr. Grider and the township in the amount of $2 million, plus $2 million in punitive damages, which they alleged they were entitled to because Mr. Grider had made the defamatory statements "with actual malice, knowledge of the falsity or a reckless disregard as to [their] truth or falsity."

¶ 8 Plaintiffs also named Stickney Township Supervisor Lou Viverito as a respondent in discovery under section 2-402 of the Code of Civil Procedure (Code) (735 ILCS 5/2-402 (West 2014)) and then as a defendant in their first amended complaint. They alleged that when Mr. Grider was elected as township assessor, he ran on Mr. Viverito's ticket, that Mr. Viverito "bankrolled" the ticket, and that over the years Mr. Viverito had helped Mr. Grider secure appointments to various government positions. Plaintiffs further alleged that Mr. Viverito was "at odds with" Mr. Kainrath and Mr. Pyle and that they believed he possessed "information essential to the determination of other persons who should properly be named as additional Defendants in this action."

¶ 9 The trial court dismissed the conspiracy claims against Mr. Viverito, with prejudice on the second amended complaint. The court never allowed the plaintiffs to depose Mr. Viverito.

¶ 1    Mr. Grider moved to dismiss the complaint, arguing that he enjoyed statutory immunity, that as a member of the executive branch his statements were privileged, and that this was a retaliatory lawsuit prohibited by the Citizen Participation Act. The court denied Mr. Grider's two motions to dismiss.

¶ 2              B. Motions for Summary Judgment and Interlocutory Appeal

¶ 3    Asserting the same legal arguments made in Mr. Grider's earlier motions to dismiss, Mr. Grider and Stickney Township unsuccessfully moved for summary judgment. We allowed a discretionary appeal from that interlocutory order under Illinois Supreme Court Rule 306(a)(9) (eff. July 1, 2017)—solely on the issue of whether the trial court should have summarily dismissed this litigation under the Citizen Participation Act. *Kainrath*, 2018 IL App (1st) 172270, ¶ 17. Concluding that plaintiffs' claims had potential merit and that defendants were thus not entitled to relief under the Act, we affirmed that portion of the trial court's order. *Id.* ¶ 55.

¶ 4                        C. Pretrial Motions

¶ 5    The case then advanced to trial before a different judge. Plaintiffs argued that they should be allowed to present evidence at trial that Mr. Grider's motive in sending the June 2015 letter was to return the many favors done for him by Mr. Viverito. Although motive was not an element of their causes of action, plaintiffs argued the jury needed to understand that "Mr. Viverito was the one who had the major dispute with the plaintiffs" and that Mr. Grider "put out this letter at the behest [of] or for Mr. Viverito," the person who allowed Mr. Grider to run on his ticket and gave Mr. Grider "every job *** that [he had] ever had since he was an adult." Absent such evidence, plaintiffs insisted, the jury would be left only with Mr. Grider's unrebutted explanation that the letter was the innocent result of an investigation he felt duty-bound to undertake.

¶ 6    Defense counsel argued in response that plaintiffs were trying "to use motive as a cloak to

set up this conspiracy," that it would "confuse the jury," be "a waste of time," and lead to "a trial within a trial for a claim that [had] already [been] thrown out." The trial court agreed, concluding that all of the extraneous information about Mr. Viverito would be "more prejudicial than probative" and would not help the jury decide the real issue in the case—whether Mr. Grider's letter was defamatory.

¶ 7                                   D. Trial and Verdict

¶ 8      At the week-long trial held in this matter, the jury heard testimony from plaintiffs and their spouses, from Mr. Grider, and from a number of other individuals, including employees of the Burbank Zoning Department, an individual familiar with the city's permitting process, the assessor of another local municipality, someone Mr. Grider claimed Mr. Kainrath had given preferential treatment to when issuing building permits, and several employees of the division of the Cook County Assessor's office responsible for investigating erroneous homeowner's exemptions.

¶ 9      Mr. Grider testified that he became aware of a building permit to erect a swimming pool on undeveloped land and, upon further inquiry, learned that there was in fact a home on the property, even though Mr. Kainrath's office had never sent the building permit for that structure to Mr. Grider's office for review. According to Mr. Grider, this led him on a three-month-long investigation of Mr. Kainrath and those with whom Mr. Kainrath had entered into real estate deals. Mr. Grider insisted that he undertook this investigation in good faith and in an effort to make a truthful report to his constituents. Mr. Grider acknowledged that, "probably an hour or two before [he] sent it out," he showed the letter detailing his findings to Mr. Viverito and Mr. Viverito told him to "do what [he thought was] best."

¶ 10     Mr. Grider acknowledged that this was the first and only investigation he performed in his role as the township's assessor and that, shortly after sending his June 2015 letter, the Cook County

Assessor told him that he had no authority to conduct such investigations. On cross-examination by defense counsel, Mr. Grider testified that he believed it was his duty as an elected official to look out for taxpayers and that he had "leeway to do some research, if necessary." Mr. Grider did not approach Mr. Kainrath with his concerns or go to his own father, who was a Burbank alderman; the mayor of Burbank, whom Mr. Kainrath worked under; or the Cook County Assessor to report his concern about plaintiffs before drafting and sending his letter.

¶ 11     Mr. Grider further acknowledged that he had previously sent out other, anonymous, letters about plaintiffs, including a letter to the Cook County President accusing Mr. Aguirre of receiving an illegal homeowner's exemption and a letter asking the City of Burbank to take actions against certain properties for violations of the municipal code, which he agreed he had no authority to enforce. When asked to point out where in the over 400 pages of the investigatory research he produced in this case was any document that would have led him to broaden his investigation of Mr. Kainrath to include Mr. Pyle, Mr. Grider stated "I can see if I can find the document for you. You know, I'm pretty confused and stressed out over all this." Following a recess Mr. Grider acknowledged that no such document was included in his research. He agreed that there was likewise no document indicating that Mr. Aguirre ever had anything to do with any of Mr. Kainrath's property tax appeals.

¶ 12     Mr. Kainrath's wife, Joan Kainrath, testified that their son James lived with his family on the property located across the street from where she lived with her husband. Ms. Kainrath agreed that there had been no written contract with James for the purchase of that property but stated that her husband and son had an oral contract and that James lived on the property and was responsible for paying property taxes.

¶ 13     Timothy Monahan, a former deputy assessor with the Cook County Assessor's office,

testified that he was in charge of the office's erroneous exemption unit when it investigated the allegations in Mr. Grider's June 2015 letter and in his previous anonymous letters. Mr. Monahan testified that the proper procedure for someone in Mr. Grider's position, who suspects that an erroneous exemption had been issued, is to submit an exemption inquiry. When Mr. Monahan received Mr. Grider's early anonymous letter regarding Mr. Aguirre, he looked into the allegation that Mr. Aguirre had claimed a homeowner's exemption with respect to two different properties and concluded that the allegation was unfounded. It was a fairly common case of a father and son having the same name. Mr. Monahan also testified that there "was no evidence whatsoever" that Mr. Pyle had provided Mr. Kainrath with inside access for illegal exemptions. As to Mr. Kainrath, the investigation uncovered only one "carryover" exemption that Mr. Kainrath had to pay back. Mr. Monahan explained that a carryover is a type of erroneous exemption that "happens all the time" when a homeowner's exemption is carried over from one year to the next, even though the property was sold during that time.

¶ 14   The court barred the testimony of two witnesses who would have testified about the strained relationship between plaintiffs and Mr. Viverito. The court also denied plaintiffs' counsel's request to make an offer of proof of those witnesses' testimony, stating: "You've already made your motions, and it's already preserved for ruling, your objections, Counsel. So I'm not going to sit here and convolute the record any further than has already been attempted or I believe is happening. I won't do that."

¶ 15   At defense counsel's suggestion, the court also personally admonished plaintiffs before they took the stand that strict compliance with its ruling on this matter was expected of them too, stating: "Mr. Kainrath and Mr. Aguirre pay attention to me. In regard to Mr. Viverito, don't mention his name" and "don't even attempt to blurt out [that] he told [Mr.] Grider to do this."

¶ 16     When plaintiffs' counsel argued that this prohibition was unfair, given that Mr. Grider had already testified that he showed the letter to Mr. Viverito before sending it, the court added: "That doesn't even come out. He said he showed it to him an hour before he sent it. So that's—but other than that, you have—that this was directed by [Mr.] Viverito, you have nothing."

¶ 17     The court then repeatedly admonished plaintiffs' counsel to move on or "ask another question" whenever Mr. Viverito's name was mentioned, at one point stating, "I'm sick and tired of this dance around Mr. Viverito. It's done. The ruling's made. Stop trying to attempt to elicit testimony that I've prohibited."

¶ 18     A jury instruction conference was held, in which the parties agreed that the jury should be given a number of Illinois Pattern Jury Instructions. The trial court denied plaintiffs' request for nonpattern instructions that would have called for the court determine whether Mr. Grider's letter was defamatory *per se*, whether Mr. Grider acted with actual malice, and whether he placed plaintiffs in a false light before the public. The court rejected each of these instructions as attempting to "take[ ] the trier of fact out of the case." After taking the matter under advisement, and upon consideration of the evidence presented at trial, the court also rejected defendants' attempt to keep the issue of punitive damages from the jury.

¶ 19     The jury ultimately concluded that Mr. Grider had placed Mr. Kainrath in a false light but had not defamed him and awarded Mr. Kainrath no damages. The jury concluded that Mr. Grider had both defamed and placed each of the other two plaintiffs in a false light. They awarded Mr. Aguirre $20,000 in compensatory damages and $150,000 in punitive damages and Mr. Pyle $7000 in compensatory damages and $20,000 in punitive damages.

¶ 20     Defendants' motion for a directed verdict at the close of evidence, in which they argued both that plaintiffs had failed to prove the elements of their causes of action and that the evidence

at trial supported and proved defendants' affirmative defenses, was denied by the trial court. Following entry of the jury's verdict, the court also denied defendants' motion for a judgment notwithstanding the verdict and for remittitur of the punitive damages award. Finally, the court denied plaintiffs' posttrial motion seeking a new trial based on erroneous jury instructions, the improper barring of witnesses, rulings on motions *in limine*, and other purported errors at trial.

¶ 21    The court noted that although "[b]oth sides would like [it] to invade the province of the jury and indicate and set aside the verdict," the pertinent question was "was there prejudice which warrant[ed] a new trial?" It was clear to the court that there was not. The jury found in plaintiffs' favor on five of the six counts but awarded relatively minimal damages. In the court's opinion, any prejudice plaintiffs suffered was due, not to trial error, but to the behavior of their counsel, whom the court cited for coaching his witnesses, repeatedly engaging with the trial court judge on the record, and blatantly attempting to evade the court's evidentiary rulings.

¶ 22    The court likewise rejected defendants' argument that the $170,000 in punitive damages the jury awarded to plaintiffs in this case was "based on prejudice and corruption of the jury due to Plaintiffs' and Plaintiffs' counsel's misconduct throughout the trial," explaining that, though on its face this was a compelling argument, the court had looked and "could not find anything" to support it—"no basis in law and/or fact."

¶ 23    This appeal followed.

¶ 24                                  II. JURISDICTION

¶ 25    The trial court's order denying the parties' posttrial motions in this matter was entered on January 7, 2020. On February 6, 2020, plaintiffs and defendants separately filed timely notices of appeal from that order, from the judgment entered on the jury's verdict of May 23, 2019, and from various interlocutory orders. We consolidated the appeals and, for briefing purposes only,

designated defendants' appeal as the primary appeal and plaintiffs' appeal as the cross-appeal. We have jurisdiction over these appeals pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments entered by the trial court in civil cases.

¶ 26                                    III. ANALYSIS

¶ 27    As noted above, this is the second time this case has come to this court. The parties have filed almost 200 pages of briefing. The record is fourteen volumes long. The plaintiffs, who prevailed at trial on five of their six claims, raise as many issues as the defendants. The defendants, who ended up with a modest award against them, rather than the multimillion dollars plaintiffs sought, continue to insist that they cannot have liability, based in part on arguments that we already rejected on interlocutory appeal.

¶ 28    As we have long recognized, "[p]arties are entitled to a fair trial, not a perfect one. Technical errors or misrulings which are not found to be prejudicial provide no basis for upsetting a jury's verdict." *McShane v. Chicago Investment Corp.,* 235 Ill. App. 3d 860, 878–79 (1992). Like the court in *McShane*, we believe that the parties received a fair trial ably presided over by a conscientious judge and resulting in a jury verdict that disappointed both sides but which should not be disturbed on appeal. *Id.*

¶ 29                          A. Compliance With Rule 341

¶ 30    Before turning to the many grounds for reversal raised by each side on appeal, we briefly address defendants' request that we strike and refuse to consider portions of plaintiffs' appellate brief on the basis that they have engaged in the "widespread practice of merely dumping legal citations" without "any explanation as to how the citations apply to this case or the issues raised." As defendants note, Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), governing the form

and substance of appellate briefs, requires that the argument section of a brief include "the contentions of the [party] and the reasons therefor, with citation to the authorities and the pages of the record relied on."

¶ 31    In this appeal, both sides have raised a host of issues and sub-issues, many of which are not fully supported or explained. Each party has also failed to respond directly to many of the other side's arguments. The inadvisability of such a strategy notwithstanding, we find no forfeiture. To the extent we can discern them, the numerous issues raised by both sides will be decided on the merits. To that end, we have attempted to group and address them in some logical order.

¶ 32                    B. Defendants Are Not Entitled to Judgment as a Matter of Law

                    Based on Tort Immunity, Privilege, or a Lack of Evidence of Malice

¶ 10    We first address the three arguments, made by defendants, for why they are entitled to judgment as a matter of law. Defendants insist that (1) Mr. Grider was absolutely immune from liability under section 2-210 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act or Act) (745 ILCS 10/2-210 (West 2014)); (2) in writing his letter Mr. Grider was acting with either an absolute privilege or with a qualified privilege that he did not abuse, and (3) there was no evidence of malice and proof of malice was required for plaintiffs to prevail.

¶ 11    These arguments are primarily legal ones and whether a party was entitled to judgment as a matter of law is a question we review *de novo,* no matter at what point that argument was raised. *Dynak v. Board of Education of Wood Dale School District 7*, 2020 IL 125062, ¶ 15 (summary judgment); *Lawlor v. North American Corporation of Illinois*, 2012 IL 112530, ¶ 37 (directed verdict and judgment *n.o.v.*). The defendants in this case were not entitled to judgment as a matter of law on any of these bases.

12

¶ 12          1. Immunity Under Section 2-210 of the Tort Immunity Act

¶ 13    Defendants maintain that Mr. Grider is absolutely immune from liability under section 2-210 of the Tort Immunity Act and that summary judgment or judgment notwithstanding the verdict should have been granted to them on that basis. The purpose of the Tort Immunity Act is "to protect local public entities and public employees from liability arising from the operation of government." 745 ILCS 10/1-101.1(a) (West 2014). Section 2-210 of the Act specifically provides that "[a] public employee acting in the scope of his employment is not liable for an injury caused by his negligent misrepresentation or the provision of information ***." 745 ILCS 10/2-210 (West 2014). And under section 2-109 of the Act, "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." *Id.* § 2-109.

¶ 14    Here, there appears to be no dispute that Stickney Township is a "local public entity" under the Act (745 ILCS 10/1-206 (West 2014)), or that Mr. Grider, as its assessor, was a "public employee" (745 ILCS 10/1-202, 1-207 (West 2014)). Plaintiffs argue however, as the trial court found in denying summary judgment, that writing this letter and sending it to numerous publications was simply not within the scope of Mr. Grider's duties as assessor.

¶ 15    To determine whether an employee's actions are within the scope of his or her employment, our supreme court has adopted the criteria set out in section 228 of the Restatement (Second) of Agency. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 164-65 (2007). That section provides generally that an act is within the scope of a servant's employment "if, but only if" it: (1) "is of the kind he is employed to perform," (2) "occurs substantially within the authorized time and space limits," and (3) "is actuated, at least in part, by a purpose to serve the master." Restatement (Second) of Agency § 228 (1958). Conversely, "[c]onduct of a servant is *not* within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space

limits, or too little actuated by a purpose to serve the master." (Emphasis added.) *Id.*

¶ 16    Defendants maintain that Mr. Grider's duties as Stickney Township Assessor included "addressing and reporting on apparent discrepancies in the tax rolls, thereby making sure taxpayers [paid] their fair share of property taxes," and that "based on his research," Mr. Grider learned and felt duty bound to inform the public that plaintiffs "were using their positions in government to receive lower property tax bills." Consistent with his testimony at trial, Mr. Grider stated in an affidavit submitted early in this case that he prepared the June 2015 letter "in [his] capacity as the Assessor for Stickney Township." He prepared the letter at his office, using resources available to him as a township assessor, and sent the letter in an official township envelope. According to defendants, "sending the letter was actuated, at least in part, in serving [Mr.] Grider's employer."

¶ 17    As the excerpt that follows demonstrates, however, by the time of his deposition in this case, even Mr. Grider no longer believed that it was part of his job to report the things he said in his June 2015 letter:

"Q. You felt it was your obligation to bring these allegations to light?

A. At that time, I did, yes.

Q. Do you still feel it's your obligation to bring these things to light?

A. No. I was informed by Tom Jockanetti (phonetic) that I have no investigatory powers.

Q. When did he inform you of that?

A. Probably after I sent the letter to Mr. Berrios's office.

Q. How did he inform you of that?

A. I believe it was a phone call.

Q. Anything else you remember about that phone call?

14

A. No. Just that they said that I don't have any investigatory powers.

Q. Do you know who Tom Jockanetti is, correct?

A. Yes, I do.

Q. Who is he?

A. Well, at the Board of Review, he was the chief of staff for Joe Berrios, I believe, when I was there. I'm not sure of his official capacity at the County assessor's office now, but I know he still works on behalf of Joe Berrios at the County assessor's office[.]"

Based on this testimony, the trial court properly denied the defendants summary judgment based on tort immunity, since sending the June 2015 letter was not work of "the kind [Mr. Grider was] employed to perform" as a township assessor. Restatement (Second) of Agency § 228 (1958).

¶ 18 Defendants renewed their argument in favor of a finding of tort immunity in their posttrial motion. The trial "evidence" they cite in support of their argument that this motion should have been granted is Mr. Grider's testimony that he wrote the letter on his township computer and while on the clock. This testimony does nothing to overcome the fact that sending this kind of letter and doing the investigation that he claimed to have done before sending the letter was not Mr. Grider's job. Moreover, even if conveying the results of an investigation of this sort to authorities had been part of his job duties, Mr. Grider broadly shared the letter with news outlets and this went far beyond any possible description of Mr. Grider's job duties.

¶ 19                                    2.  Privilege

¶ 20 We addressed the issue of privilege at length in our prior opinion in this case. *Kainrath*, 2018 IL App (1st) 172270, ¶¶ 33-46. This was because defendants' argument in that appeal was that they were entitled to protection under the Citizens Participation Act because plaintiffs' claims

were meritless. One of the arguments they raised to attempt to demonstrate a lack of merit was that Mr. Grider's letter was covered by absolute or qualified privilege.

¶ 21     We held that there was no absolute privilege since that would apply only to a superior executive officer, such as a governor. *Id.* ¶42. As we noted then:

> "[A]bsolute privilege has historically been 'narrowly applied to legislative, judicial and certain military officers and proceedings' and 'high executive officials.' *Id.* at 6; see also Restatement (Second) of Torts § 591(b) (1977) (noting that, at the state level, application of the privilege is limited to the 'governor or other superior executive officer of a state'); Restatement (Second) of Torts Appendix § 591, Reporter's Note, at 21 (1981) (explaining that '[t]he majority of the state courts have declined to extend the absolute privilege beyond the superior state officers and have recognized as to other officers only a conditional privilege'). This is in keeping with society's interest in 'the unfettered discharge of public business' that such proceedings entail and such individuals are charged with. (Internal quotation marks omitted.) *Blair*, 64 Ill. 2d at 6. We agree with plaintiffs that Mr. Grider's level of executive authority cannot be compared to that of other public officials, for whom Illinois courts have recognized an absolute privilege. See, *e.g.*, *id.* at 7 (extending the privilege to statements made by the Governor); *Geick v. Kay*, 236 Ill. App. 3d 868, 876 (1992) (extending it to statements made by mayors of Illinois municipalities)." *Id.*

¶ 22     As plaintiffs point out, unless our earlier ruling on this issue was "palpably erroneous," our rejection of this defense is "law of the case," that is binding in this subsequent appeal. *American Service Ins. Co. v. China Ocean Shipping Company (Americas) Inc.*, 2014 IL App (1st) 121895, ¶ 17. Defendants argue that they are not bound by this ruling because it was based on summary judgment evidence and further evidence was adduced at trial. However, no new evidence was

presented as to Mr. Grider's position or that could in any way further support a claim of absolute immunity based on his being a high ranking executive official. Our ruling was based on settled precedent and is also law of the case. We will not revisit it.

¶ 23    We also addressed qualified privilege, which defendants argued in the alternative, in the prior appeal. *Kainrath*, 2018 IL App (1st) 172270, ¶45. A qualified privilege arises when: (1) an interest of the person who published the defamatory statement is implicated, (2) an interest of the person to whom the statement was published or of some other third person is implicated, or (3) a recognized public interest is implicated. *Kuwik v. Starmark Star Marketing Administration, Inc.*, 156 Ill. 2d 16, 29 (1993).

¶ 24    The qualified privilege is not absolute; rather, its existence "serves to enhance a defamation plaintiff's burden of proof." *Id.* "Where no qualified privilege exits, the plaintiff need only show that the defendant acted with negligence in making the defamatory statements to prevail." *Id.* "[O]nce a defendant establishes a qualified privilege," however, "a plaintiff must prove that the defendant either intentionally published the material while knowing the matter was false, or displayed a reckless disregard to the matter's falseness"—*i.e.*, published the statements "despite a high degree of awareness of probable falsity" or while entertaining "serious doubts as to [their] truth." (Internal quotation marks omitted.) *Id.* at 24-25. "An abuse of a qualified privilege may consist of any reckless act that shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, to limit the scope of the material, or to send the material to only the proper parties." *Id.* at 30.

¶ 25    We noted in the interlocutory appeal, as we confirm here, that "even if such a privilege arose, there is at least a question of material fact regarding whether Mr. Grider abused the privilege by sending his 2015 letter to parties not reasonably believed to be necessary to accomplish any

proper purpose." *Kainrath*, 2018 IL App (1st) 172270, ¶ 46. Defendants do not claim that the jury was improperly instructed on abuse of the privilege and the verdict clearly reflects a finding that, if there was such a privilege, it was abused. Thus, defendants are not entitled to judgment in their favor on the basis of a qualified privilege.

¶ 26                                3. Evidence of Actual Malice

¶ 27    Finally, we consider defendants' argument that they were entitled to judgment in their favor as a matter of law because plaintiffs did not provide evidence that Mr. Grider acted with actual malice. To succeed on a claim for defamation, a plaintiff generally must prove three things: (1) that the defendant made a false statement about the plaintiff, (2) that the defendant published that statement to a third party, and (3) that the publication caused the plaintiff damages. *Id.*, ¶¶ 32, 34. To preserve the free-speech protections afforded by the first amendment to the United States Constitution, however, the United States Supreme Court held in *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964), that a public official may only recover damages for the publication of defamatory statements where it is also proved that the defamatory statement was made with "actual malice." *Winters v. Greeley*, 189 Ill. App. 3d 590, 593 (1989). To succeed on a claim of false light a plaintiff must similarly establish that the defendant "acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false." *Dubinsky v. United Airlines Master Executive Council*, 303 Ill. App. 3d 317, 330 (1999).

¶ 28    Defendants contend that when Mr. Grider sent his June 2015 letter, plaintiffs were "undoubtedly public officials." Mr. Kainrath was the building commissioner for the City of Burbank, a position he was appointed to by the mayor. In that role he decided which building permits would issue, ensured compliance with building codes and local ordinances, and reported

18

directly to the mayor and alderman. Mr. Pyle was himself one of those seven aldermen elected by the residents of Burbank. And Mr. Aguirre served as a trustee of the South Stickney Sanitary District, a position he was appointed to by the County Board President, and pursuant to which he was tasked with providing for the collection and disposal of sewage and the preservation of the water supply from contamination.

¶ 29    Plaintiffs insist that they were not public officials, first by disingenuously referring to Mr. Kainrath and Mr. Aguirre as "retired" when it is clear from their discovery responses that their retirement occurred only after Mr. Grider sent his letter. Plaintiffs also argue that they never enjoyed the authority or discretion necessary to be considered public officials. However, none of these facts matter.

¶ 30    The jury was instructed in this case, at defendants' request, that plaintiffs had to prove malice on both of their claims and actual malice was defined for the jury as a statement "made with actual knowledge that the statement was false, or with reckless disregard for whether the statement is true or false." Thus, assuming without deciding that malice was a required element of these claims, defendants can only succeed if the evidence of malice was insufficient as a matter of law. It was not.

¶ 31    Defendants point to *Costello v. Capital Cities Communications, Inc.*, 125 Ill. 2d 402, 421 (1988), where our supreme court held that "failure to investigate does not itself establish actual malice if the defendants did not seriously doubt the truth of their assertions." Defendants also liken this case to *Piersall v. SportsVision of Chicago*, 230 Ill. App. 3d 503, 510 (1992), in which this court applied that rule and concluded that, "[n]othing in the record, even with the benefit of reasonable inferences, support[ed] a finding of knowing falsity" on the part of a major league baseball team owner who called a broadcast announcer a liar without first investigating the basis

for that claim. Here, in contrast, Mr. Grider's letter was not a spontaneous, isolated statement of opinion but a carefully assembled compilation of specific, objectively verifiable facts that he claims were made after a full investigation. The jury was entitled to find that these statements were made with actual knowledge that they were false or with reckless disregard for the truth.

¶ 32          C. Plaintiffs' Arguments Regarding Defendant Louis Viverito

¶ 33    Plaintiffs contend that they are entitled to a new trial because the trial court erred in dismissing the civil conspiracy claims against Mr. Viverito with prejudice and compounded that error by refusing to allow them to take Mr. Viverito's deposition or to allow any witness to discuss him or his role in this controversy at trial. We reject each of these related arguments.

¶ 34    We first reject plaintiffs' argument that, as stated in their first and subsequently in their second amended complaint, their allegations against Mr. Viverito were sufficient to state a claim that he conspired with Mr. Grider to defame them or place them in a false light and that the trial court erred in granting Mr. Viverito's motion to dismiss.

¶ 35     A motion to dismiss for failure to state a claim is brought under section 2-615 of the Code and attacks the legal sufficiency of the complaint. 735 ILCS 5/2-615 (West 2014). "The essential question is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted." *Cochran v. Securitas Security Services USA, Inc.*, 2017 IL 121200, ¶ 11. Well pleaded facts are taken as true but conclusions of law unsupported by specific factual allegations are not. *Schweihs v. Chase Home Finance,* LLC, 2016 IL 120041, ¶ 27. Our review of an order dismissing a complaint under this section is *de novo*. *Id.*

¶ 36    To succeed on a claim of civil conspiracy requires proof that a defendant "knowingly and voluntarily participate[d] in a common scheme to commit an unlawful act or a lawful act in an

20

unlawful manner." (Internal quotation marks omitted.) *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999). To state a claim for civil conspiracy, a plaintiff must allege both the existence of an agreement and that one of the parties to the agreement committed a tortious act in furtherance of it. *Id.* Here, plaintiffs alleged that Mr. Grider, as a member of the conspiracy, committed the tortious act of sending the June 2015 letter defaming them. What the circuit court found was lacking from plaintiffs' complaint were facts that, if taken as true, would establish an agreement between Mr. Grider and Mr. Viverito to do something unlawful.

¶ 37    Plaintiffs insist that all they were required to allege here was the "ultimate fact" of Viverito's conspiracy with Grider, and that under liberal pleading standards, the trial court was then bound to take that allegation as true. We disagree. As our supreme court has repeatedly stressed, "Illinois is a fact-pleading jurisdiction" (*Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429, (2006). This means that "although pleadings are to be liberally construed and formal or technical allegations are not necessary, a complaint must, nevertheless, contain facts to state a cause of action." *People ex rel. Fahner v. Carriage Way West, Inc.*, 88 Ill. 2d 300, 308 (1981). "Fact pleading imposes a heavier burden on the plaintiff, so that a complaint that would survive a motion to dismiss in a notice-pleading jurisdiction might not do so in a fact-pleading jurisdiction." *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 368 (2005).

¶ 38    What is plainly lacking here is any unequivocal allegation of an agreement. Plaintiffs did not allege but speculated that Mr. Viverito "*likely* wanted to retaliate against [them]," that Mr. Grider sent his letter "*[p]resumably* at [Mr.] Viverito's request and encouragement," and that Mr. Grider "*likely* worked at [Mr.] Viverito's direction *** or agreed with [Mr.] Viverito to send [the letter] out." (Emphases added.) The only unqualified facts asserted—that Mr. Grider and Mr. Viverito each had reasons for wanting to damage plaintiffs' reputations and that the two worked

21

in the same building—do not allege a conspiracy so much as an opportunity to conspire. That is simply not enough.

¶ 39     Our supreme court has made clear that "[t]he mere characterization of a combination of acts as a conspiracy is insufficient to withstand a motion to dismiss." *Buckner v. Atlantic Plant Maintenance, Inc*., 182 Ill. 2d 12, 23 (1998). Instead, a complaint "must set forth with particularity the facts and circumstances constituting the alleged conspiracy." *Heying v. Simonaitis,* 126 Ill. App. 3d 157, 163 (1984); see also *Cameron v. Owens-Corning Fiberglas Corp*., 296 Ill. App. 3d 978, 986 (1998) (noting that "bare allegations of conspiracy are insufficient to plead conspiracy as a matter of substantive liability").

¶ 40     Plaintiffs argue, in the alternative, that the trial court should not have barred them from taking Mr. Viverito's deposition and that, had they been afforded that opportunity, they may have been able to successfully amend their complaint to state a claim against him. They also contend that they should have been allowed to present evidence to the jury of Mr. Viverito's animus toward the plaintiffs and his encouragement of Mr. Grider as well as their relationship, in order to prove Mr. Grider's motive in sending the letter. We reject these alternative arguments

¶ 41     A trial court's decision on discovery matters will not be overturned on appeal, absent an abuse of discretion. *Robinson v. Point One Toyota, Evanston,* 2012 IL App (1st) 111889 ¶ 54. The record does not include any transcript that explains the trial court's rulings in repeatedly rejecting plaintiffs' requests to take Mr. Viverito's deposition. Absent such a record, this court must presume that the court acted properly in denying this discovery. *Brostron v. Warmann*, 190 Ill. App. 3d 87, 92 (1989).

¶ 42     In reference to the trial court's refusal to allow the plaintiffs to present evidence of Mr. Viverito's involvement and animus towards them, although he was not a defendant, again plaintiffs

22

must overcome the great discretion that is given to the trial court on such matters. Here, The trial court had twice denied plaintiffs' motions to compel Mr. Viverito's deposition and had also stricken a number of inflammatory allegations concerning Mr. Viverito's political power and purported history of corruption from plaintiffs' amended complaint. The court was understandably concerned that the introduction of any extraneous information about Mr. Viverito at trial would be more prejudicial than probative and would not help the jury decide the real issue in the case— whether Mr. Grider's letter was defamatory. Trial courts are afforded great discretion when balancing the probative value of challenged evidence against the likely prejudice resulting from its admission. *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 104 (2008). We are not convinced that the court abused its discretion in this case.

¶ 43    Moreover, even if we thought the trial court had abused its discretion when it limited evidence as to motive, we are hard pressed to imagine how the plaintiffs were prejudiced. Their claim is that evidence of Mr. Viverito's animus toward the plaintiffs was necessary to overcome Mr. Grider's claim that he was just doing his job and investigating wrongdoing. In other words, they needed evidence about Mr. Viverito to prove Mr. Grider's motive. But the plaintiffs won on five of their six claims.

¶ 44    Based on the jury's verdict, and the jury instructions tendered, the jury necessarily found that Mr. Grider acted with actual malice. Where there is evidence of actual malice, it is unnecessary to also prove motive. *Winters*, 189 Ill. App. 3d at 594 ("Where a public figure plaintiff establishes by clear and convincing evidence that the defendant acted with knowledge or reckless disregard of the falsity of the defamatory statement, it is unnecessary to additionally prove the existence of personal animosity, evil motive or intent to injure the plaintiff to recover damages for the defamation."). Thus, the verdict in plaintiffs' favor negates any claim that they were prejudiced by

the court's limitations on their evidence of Mr. Viverito's animus to prove Mr. Grider's motive in sending the letter.

¶ 45    Plaintiffs suggest that the damages award might have been influenced by that limitation. However, they offer no specifics to support this argument and it appears to be purely speculative. The jury clearly found that the injuries plaintiffs suffered were either limited or nonexistent. This would not have changed with evidence that Mr. Grider was motivated by a desire to help Mr. Viverito as a political ally.

¶ 46               D. The Trial Court Made No Reversible Evidentiary Error

¶ 47    Plaintiffs argue that the trial court improperly allowed cross-examination of Mr. Aguirre, about an investigation of misconduct by the Cook County Inspector General. They also contend that the trial court improperly barred them from presenting evidence regarding the Cook County Assessor's conclusions and that they should have been able to show the jury the statutes that Mr. Grider accused them of violating in his defamatory letter. None of these evidentiary rulings is a basis for awarding plaintiffs a new trial.

¶ 48    It is well settled that, the trial court's decision to admit or bar evidence will not be reversed absent an abuse of discretion and that such an abuse occurs only where "no reasonable person would take the position adopted by the trial court." (Internal quotation marks omitted.) *Fronabarger v. Burns*, 385 Ill. App. 3d 560, 564 (2008). None of these evidentiary rulings comes anywhere close to being an abuse of discretion.

¶ 49    The plaintiffs argue that the trial court should have struck certain questions asked on cross-examination about Mr. Aguirre being the target of the Inspector General's investigation and should have instructed the jury to disregard them. Mr. Aguirre was asked by counsel for the defendants whether, when he was trustee of the South Stickney Sanitation District, he was the subject of an

investigation by the Cook County Inspector General's office into unlawful mileage allowance funding. Mr. Aguirre responded "no" and that others in his office were being investigated. Later he acknowledged that the Inspector General did find that the $4800 for mileage allowance that he had authorized was improper. On redirect, he testified that he was the one who had alerted the Inspector General to the problem with mileage allowances and requested the investigation. Later on redirect, plaintiffs' counsel volunteered in front of the jury that they would like to "see a copy of the IG report that supposedly names [Mr. Aguirre] as being somehow guilty of something." The trial court did tell the jury to disregard this remark and Mr. Aguirre's answer in agreement. In short, the record reflects nothing more than a dispute as to the focus of the Inspector General's report, all of which was heard by the jury. There is no showing that the defense lacked any good faith basis for asking these questions. Moreover, plaintiffs offer absolutely no explanation as to how they were injured by the trial court's refusal to strike this line of questioning.

¶ 50    Plaintiffs also argue that the trial court erred in barring them from presenting evidence that the Cook County Assessor found "no merit" to Mr. Grider's accusations of wrongdoing by the plaintiffs. Again, however, the jury found in favor of the plaintiffs on five of their six claims. The jury clearly found that what Mr. Grider said in his letter was not true. Thus, we cannot discern how plaintiffs could have been prejudiced by the trial court's decision to bar this testimony about whether Mr. Grider's accusations were found to be true by the Cook County Assessor.

¶ 51    Finally, plaintiffs argue, with no legal support, that the court was required to allow them to show the jury the statutes that Mr. Grider accused them of violating. We are not sure how this was relevant, and it is certainly not at all clear how plaintiffs' case was harmed by this ruling.

¶ 52       E. Plaintiffs Are Not Entitled to a New Trial Based on Erroneous Jury Instructions

¶ 53    Plaintiffs take issue with a number of the instructions that were given to the jury in this

case. "In general, a trial court has discretion to determine the appropriate jury instructions, and its determination will be reversed for an abuse of discretion." *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278, ¶ 63. To preserve such a challenge for appeal, a party must make a specific objection and tender an alternative instruction at the jury instruction conference, thereby giving the trial court an opportunity to correct the problem. *Id.* Even if an erroneous instruction is given, reversal is warranted only where the party objecting to the instruction can show "serious prejudice" to their right to a fair trial. *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 28.

¶ 54                               1. Instructions Related to Liability

¶ 55    Plaintiffs make various challenges to five of the instructions given related to liability, including the issues instruction, the instruction that substantial truth was a defense, the instruction on qualified privilege, the instruction on tort immunity, and the instructions on defamation *per se* and defamation *per quod.* All of these arguments fail for the same two reasons. First, as we have noted, plaintiffs *prevailed* on five of their six claims—false light claims against Mr. Grider brought by all three plaintiffs and defamation claims against him by two of the three plaintiffs. This suggests that the jury rejected the defenses asserted by defendants and were not prevented by any erroneous recitation of the law from finding that plaintiffs proved each of the elements of their claims. Plaintiffs have failed to explain why any of these instructions had an impact on the one claim they did not prevail on—the defamation claim brought by Mr. Kainrath. Absent a compelling explanation for why any of these instructions caused them serious prejudice, plaintiffs' have articulated no reversible error. *Id.*

¶ 56    Second, plaintiffs have not shown this court that they tendered any alternative instructions that properly stated the law. Plaintiffs' briefs contain no citations to the record directing this court to their own tendered instructions relative to the instructions they are objecting to. To the extent

the court can discern for itself what plaintiffs tendered, it is clear that some of those instructions completely misstated the law. For example, one of the plaintiffs' proposed instructions was that the letter written by Mr. Grider "was defamatory *per se.*" But it was clearly up to the jury to decide if plaintiffs had proved that the letter was defamatory. *Tuite v. Corbitt*, 224 Ill. 2d 490, 509 (2006). Thus, we reject all of plaintiffs' arguments related to the instructions on liability.

¶ 57                                    2. Instructions on Damages

¶ 58    Plaintiffs' argument that the jury instructions on damages "misstated the law" is, in our view, barely comprehensible. The thrust of that argument appears to be that the jury was not properly instructed on the difference between general and special damages. Plaintiffs insist, for example, that although the jurors were instructed that "special damages" could be awarded for defamation *per quod*, special damages was never defined for them. We disagree. The instruction clearly referred to special damages as "actual monetary damages." It was also made sufficiently clear to the jurors both that general damages are presumed in cases of defamation *per* se (*Lorillard v. Field Enterprises, Inc.,* 65 Ill. App. 2d 65, 78 (1965)) and that the presumption is a rebuttable one (*Knight v. Chicago Tribune,* 385 Ill. App. 3d 347, 356 (2008)). Plaintiffs have not only failed to articulate how the challenged instructions were improper but have again failed to direct this court to their own alternative instructions on damages. We can identify no reversible error relating to the jury instructions given in this case.

¶ 59              F. The Trial Court Was Not Required to Strike or Remit

                       the Jury's Award of Punitive Damages

¶ 60    Defendants argue that the trial court should have either stricken the punitive damages award because there was no evidence to support it or remitted the amount because it was too high. Neither of these arguments have merit.

¶ 61    As we have long recognized, the jury's finding on punitive damages, is a "fact-sensitive undertaking that should be reviewed under a manifest-weight standard." *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1145 (2004). It will not be reversed "unless the manifest weight of the evidence shows that the assessment was so excessive as to demonstrate passion, partiality, or corruption on the part of the decision-maker." *Id.* Similarly, we will not reverse the trial court's refusal to remit the amount of punitive damages absent an abuse of discretion by that court. 735 ILCS 5/2-1207 (West 2018) (providing that the trial court "may, in its discretion, *** determine whether a jury award for punitive damages is excessive, and if so, enter a remittitur and a conditional new trial").

¶ 62    Defendants argue that there was no evidence that they intended to harm plaintiffs or acted with indifference to their rights because Mr. Grider wrote his letter after conducting months of research and believed that everything he said was true. However, the jury clearly rejected this defense. Moreover, even if Mr. Grider's letter was the result of a legitimate investigation into suspected wrongdoing, there was no legitimate reason to send the letter, as Mr. Grider did, to news outlets. That those news outlets did not ultimately print or report on the letter is irrelevant. In sum, there was ample basis for the jury to conclude that Mr. Grider intended to harm the plaintiffs.

¶ 63    The trial court also did not abuse its discretion in refusing to reduce the amount of punitive damages that the jury found to be appropriate. Defendants argue that the award of $170,000 was excessive, particularly in light of Mr. Grider's testimony that he makes approximately $4,000 per month and the fact that punitive damages were more than six times the compensatory damages awarded.

¶ 64    The only testimony at all about Mr. Grider's net worth was his own testimony in response to questions posed by counsel over defense counsel's objection, that his "net pay" was

28

approximately $4,000 per month. This did not tell the jury anything about his overall net worth. And it was defendants' choice not to counter that evidence with their own. See *Black v. Iovino*, 219 Ill. App. 3d 378, 394 (1991) (explaining that while it is a plaintiff's choice whether to interject evidence of a defendant's financial condition, once such evidence is elicited, the defendant may then counter it in rebuttal).

¶ 65    In support of their argument about the ratio of punitive damages to compensatory damages, defendants rely on this court's decision in *Doe v. Parrillo,* 2020 IL App (1st) 191286 ¶ 84, where we reduced an award of punitive damages that was eight times the compensatory amount to avoid "stepping over the line of constitutional impropriety" based on this ratio. As we explained in *Parrillo*, however, courts look at numerous factors when determining whether an award of punitive damages is excessive, the ratio between punitive and compensatory damages being only one such factor. *Id.* ¶ 81. The appropriateness of a given ratio also varies depending on the nature of the case (*id.*), and *Parrillo*, which involved claims of physical assault brought against a former romantic partner (*id.* ¶ 2), has nothing in common with the defamation of public figures that is at issue here.  In any event, and as defendants themselves acknowledge in their brief, our supreme court reversed this court's reduction of the punitive damages award in *Parillo* concluding, despite the eight-to-one ratio, that "the jury's punitive damages award was not unconstitutionally excessive." *Doe v. Parrillo*, 2021 IL 126577, ¶ 58. Similarly, here, defendants do not persuade us that the trial court abused its discretion in refusing to remit these damages based on the ratio of punitive to compensatory damages and due process concerns.

¶ 66          G. Neither Party is Entitled to a New Trial Based on Hostility of the

Trial Court Judge or Misconduct of Plaintiffs' Counsel

¶ 67    Both sides also include the catch-all argument that they are entitled to a new trial due, in

the case of plaintiffs, to the hostility of the trial judge and, in the case of defendants, to the behavior of plaintiffs' counsel, which defendants insist "corrupted" the jury. We have reviewed the record and conclude that it reflects nothing more than the regrettable but unfortunately not uncommon escalation of tensions between trial counsel who relentlessly pushes back against rulings he disagrees with and an exasperated trial court that winds up preemptively blocking questions even where no objection has been made in an effort to keep the jury focused on proper evidence. Given the record as a whole and the eventual outcome, the most that can be said is that the trial was an unnecessarily stressful experience for all involved. No one, however, was denied a fair trial, and a new trial is simply not warranted based on the parties' complaints of hostility or misconduct.

¶ 68                                    IV. CONCLUSION

¶ 69    As this court has often noted, "[p]arties are entitled to a fair trial, not a perfect trial." *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 855 (2010). This has been protracted litigation that culminated in a lengthy trial. The jury found for the plaintiffs on five of their six claims and awarded limited damages. We find no reversible error and affirm the judgment of the trial court.

¶ 70    Affirmed.